UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:25-cv-00252-PGB-UAM

BRANDI TURNER, individually, and
as the Personal Representative for the
Estate of T'Yonna Major, and GARY
LYONS as the Personal Representative
for the Estate of Dylan Lyons,

       Plaintiffs,

vs.

JACKSON B. KEYES, an individual,
and JOHN MINA, in his official capacity
as Sheriff of Orange County,

       Defendants.

_____/

**DEFENDANT JOHN MINA'S
MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Defendant JOHN MINA in his official capacity as Sheriff of Orange County,

Florida, by and through undersigned counsel and pursuant to Fed. R. Civ. P.

12(b)(6), moves to dismiss the Second Amended Complaint (Doc. 36).

**I.     BACKGROUND AND SUMMARY OF ALLEGATION**

1.    This is an action brought pursuant to 42 U.S.C § 1983 seeking

compensatory and punitive damages for discrimination on the basis of race in a

federally subsidized program in violation Title VI of the Civil Rights Act of 1964.

Plaintiffs do not seek injunctive relief in any form to ensure that federal funds received by Sheriff Mina in the future are spent in a nondiscriminatory manner. Plaintiffs have also asserted state law claims of negligence pursuant to this court's pendant jurisdiction. The Second Amended Complaint (SAC) alleges eight counts:

Count I:     Brandi Turner - Violation of Substantive Due Process Rights against Deputy Keyes

Count II:    Estate of T'yonna Major against Deputy Jackson Keyes - Violation of Substantive Due Process Rights

Count III:   Brandi Turner against Sheriff Mina - Violation of Equal Protection Clause (*Monell*)

Count IV:    Estate of T'yonna Major against Sheriff Mina - Violation of Equal Protection Claim (*Monell*)

Count V:     Gary Lyons against Sheriff Mina - Wrongful Death (negligence)

Count VI:    Brandi Turner against Sheriff Mina - Title VI of the Civil Rights Act of 1964

Count VII:   Estate of T'yonna Major against Sheriff Mina - Title VI of the Civil Rights Act of 1964

Count VIII:  Brandi Turner & Estate of T'yonna Major against Sheriff Mina – Unspecified claims pursuant to Fla. Stat. § 768.28 for the conduct of Deputy Keyes

### A. The Events of February 22, 2023

2.      At approximately 11:00 a.m. on February 22, 2023, the deadly shooting of Nathacha Augustin occurred in Pine Hills. [Doc. 36, ¶ 17].

3.      A witness inside the car in which Ms. Augustin was shot quickly identified the shooter as Keith Moses ("Moses"), who fled the scene on foot. [Doc. 36, ¶ 18].

4.    The Orange County Sheriff's Office ("Sheriff's Office") had Moses' description but did not release it to the public for unspecified reasons. [Doc. 36, ¶¶ 19-20].

5.    Sheriff's Office deputies arrived at the scene at approximately 11:17 a.m. and processed the crime scene in 4 hours and reopened the location to the public while Moses remained at large without notifying the surrounding residents that a murderer was in the area. [Doc. 36, ¶¶ 21-22 ].[1]

6.    The SAC alleges that "as a result of this dangerous policy an armed and dangerous murderer wandered the area for hours without so much as an indication to the community that he was still lurking." [Doc. 36, ¶ 23].[2]

7.    At approximately 2:00 p.m. on February 22, 2023, Brandi Turner (Turner) picked her 9-year-old daughter T'Yonna Major (Major) up from school and entered their neighborhood to return home. [Doc. 36, ¶ 24].

8.    Turner asked Deputy Jackson Keyes, who was positioned at the entrance of the neighborhood, "about the purpose of their presence." [Doc. 36, ¶ 25].

9.    Deputy Keyes responded, "Everything is under control." [Doc. 36, ¶ 26].

---

[1] Significantly, the SAC does not allege that the Orange County Sheriff's Office determined that Moses was a suspect in the shooting or that he was still in the area.
[2] The SAC does not allege what the "dangerous policy" is.

10.     Turner relied on Deputy Keyes' representation and went home with Major unaware that an armed killer remained at large in the area. [Doc. 36, ¶ 26].

11.     Turner left her back door open. Moses entered the home and shot Turner and Major. Major tragically died from her injuries. [Doc. 36, ¶ 27-38].

12.     At some unspecified time, the Sheriff's Office notified Spectrum News 13 of the shooting of Ms. Augustin. [Doc. 36, ¶ 40].

13.     Moses fled Turner's home on foot, returned to the area where he shot and killed Ms. Augustin where Spectrum News 13 reporter Dylan Lyons was reporting on the shooting. [Doc. 36, ¶¶ 41-42].

14.     The Sheriff's Office had completed their investigation by this time and had cleared the area even though Moses remained at large. [Doc. 36, ¶ 42].

15.     Moses approached Lyons and his cameraman and shot both of them, killing Lyons. [Doc. 36, ¶¶ 43-45].

16.     Moses was then arrested in a "lackadaisical and unconcerned manner" by OCSO deputies. [Doc. 36, ¶¶ 46-54].

17.     "Upon information and belief" of Plaintiffs, the Sheriff's Office "did not dispatch aviation assistance to locate Moses despite his being on foot."[3] [Doc. 36, ¶¶ 55-57].

_____

[3]Again, the Second Amended Complaint does not allege that the Sheriff's Office had made any determination that Moses was responsible for shooting Nathacha Augustin or that the Sheriff's

**B. Pine Hills and Windermere**

18.    Pine Hills is an unincorporated subdivision of Orange County, Florida. [Doc. 36, ¶ 13]. Pine Hills is not a municipality, but it is a census designated place for purposes of compiling Census Bureau data.

19.    Windermere is a self-governing town incorporated under the laws of the State of Florida and existing within the geographic boundary of Orange County, Florida. The Town of Windermere has its own police department for the provision of public safety, crime prevention and criminal justice with it municipal boundaries.[4]

20.    The residents of Pine Hills are predominantly Black. [Doc. 36, ¶ 13].[5]

21.    Upon information and belief of the Plaintiffs the Sheriff's Office "did not dispatch aviation assistance to locate Moses despite his being on foot,"[6] and "assigns less personnel and resources to Pine Hills than its similarly situated, but

_____

Office considered him a suspect. Nor does the SAC allege that agency policy called for revealing Moses' identity to the public under the circumstances alleged.

[4] Per Fed. R. Evid. 201(b)(2), "The court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. See Town of Windermere Police Department at https://www.town.windermere.fl.us/page/police-department.

[5] The SAC also contains allegations showing that, as a percentage, more Pine Hills residents "live below the federal poverty level" when compared to Orange County. [Doc. 36, ¶ 14]. However, none of the Plaintiffs are alleged to "live below the federal poverty level" and none of the Defendant's alleged actions are alleged to premised on discriminating against people who live below the federal poverty level.

[6] Again, the SAC does not allege that the Sheriff's Office had made any determination that Moses was responsible for shooting Nathacha Augustin or that the Sheriff's Office considered him a suspect. Nor does the SAC allege that agency policy called for the use of the Aviation unit under the circumstances alleged.

primarily White, counterpart Windermere" even though Pine Hills has a crime rate that is nearly double that of Windermere. [Doc. 36, ¶¶ 55-57, 61-62].

22.     The SAC alleges that the Sheriff's Office has a policy of discrimination that results in residence of Pine Hills "not [being] treated with the same sense of urgency, importance, or respect displayed for other more affluent or White neighborhoods in Orange County." [Doc. 36, ¶¶ 58-59].[7]

23.     The Sheriff's Office discriminates against black residents living in Pine Hills, and this discrimination allegedly led to the murders of Major and Lyons [Doc. 36, ¶ 15].

## II.    LEGAL STANDARD FOR MOTION TO DISMISS

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." In determining whether to dismiss under Rule 12(b)(6), a court accepts the factual allegations in the complaint as true and construes them in a light most favorable to the non-moving party. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1269 (11th Cir. 2009). Nonetheless, "the tenet that a court must accept as true all of the

---

[7]The Second Amended Complaint does identify by name any "more affluent or White neighborhoods in Orange County." Instead, Plaintiffs refer to the City of Windermere.

allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Furthermore, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### III.    COUNT III AND COUNT IV FAIL TO STATE EQUAL PROTECTION *MONELL* CLAIMS

A governmental entity cannot be sued under § 1983 for injuries that are caused solely by its employees. *Monell v. Department of Social Services*, 98 S. Ct. 2018, 2037-2038 (U.S. 1978). A government agency may be liable pursuant to §1983 if the agency has a "policy or custom that caused the injury." *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989). For a government agency to be liable under § 1983, a plaintiff must show that the policy that caused the injury was the "moving force behind the constitutional deprivation." *Farred v. Hicks*, 915 F.2d 1530, 1532-33 (11th Cir. 1990); *see also Board of the County Commissioners v. Brown*, 520 U.S. 397, 403 (1997).

A claim for liability based on an official policy can be made by either (1) alleging an officially promulgated policy, or (2) alleging an unofficial custom or practice demonstrated through the acts of the final policymaker of the entity. *Grech v. Clayton County, Ga.*, 335 F.3d 1326, 1329-30 (11th Cir. 2003). A complaint must

also identify the policy or custom that caused the injury, so liability is not based upon an isolated incident. *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (citations omitted). A single incident of unconstitutional activity is generally insufficient to impose liability against a municipality. *Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011); *Grech*, 335 F.3d at 1330 n.6.

"The Equal Protection Clause of the Fourteenth Amendment directs states to treat similarly situated persons alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Equal protection violations arise when the state classifies and treats "some discrete and identifiable group of citizens differently from other groups." *Corey Airport Servs., Inc. v. ClearChannel Outdoor, Inc.*, 682 F.3d 1293, 1296 (11th Cir. 2012). "To sustain a claim under the Equal Protection Clause, "plaintiffs must show that the State's decision or act had a discriminatory purpose and effect.' " *Andre v. Clayton County, Georgia*, 148 F.4th 1282, 1306 (11th Cir. 2025) (quoting *Greater Birmingham Ministries v. Sec'y of State for the State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021); *Wayte v. United States*, 470 U.S. 598, 608 (1985). "If plaintiffs are unable to establish both intent [i.e., purpose] and effect, their constitutional claims fail." *Andre v. Clayton County, Georgia*, 148 F.4th at 1306.

Discriminatory purpose "implies more than intent as volition or intent as awareness. It implies that the decisionmaker ... selected or reaffirmed a particular

8

course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (internal citations omitted). To show a discriminatory effect and purpose, without direct evidence, Plaintiffs must plausibly allege that Windermere residents were treated differently than Pine Hills residents. Plaintiffs have failed to do so.

### a. Plaintiffs Fail to Allege an Unconstitutional Policy of Denying Orange County Residents Equal Protection in the Provision of Police Services

The SAC fails to allege either an official policy of the Sheriff's Office, or an unofficial custom or practice shown through repeated acts of a final policy maker.[8] The SAC merely contains vague and conclusory allegation that the Sheriff's Office allocated "less personnel and resources to Pine Hills than … Windermere." Plaintiffs complain that Moses' description was not released to the public, which would seemingly infer a policy impacting all residents of Orange County, not Pine Hills residents exclusively. Plaintiffs also complain that the crime scene was "cleaned up" and reopened to the public in about four hours. But the SAC fails to

---

[8]As indicated in the census data cited in the SAC, Windermere is an incorporated municipality (Town of Windermere), *see* United States Census Bureau, 2020 U.S. Gazetteer Files,https://www2.census.gov/geo/docs/mapsdata/data/gazetteer/2020_Gazetteer/2020_gaz_place_12.txt, with its own police department. Whereas Pine Hills is an unincorporated subdivision of Orange County.

allege how these facts inform a policy that disadvantages Pine Hills residents compared to other communities within Orange County.

As far as Plaintiffs allegations of disparate treatment, the allegations of the SAC are wanting. First, Plaintiffs do not allege that the Sheriff Office has control over the provision or allocation of law enforcement resources or services within the Town of Windermere. Second, Plaintiffs fail to identify the "Windemere area" with any degree of precision to rationally compare the allocation of public resources among residents of Windemere, residents of the Windemere area, or the census designated area of Pine Hills. Third, Plaintiffs do not allege how many "personnel" the Sheriff's Office approximately allocates to either Pine Hills or Windermere or the Windermere area. Plaintiffs do not allege that the Sheriff's Office assigns more patrol units or spends more money policing Windermere or the Windermere area as compared to Pine Hills. Fourth, the SAC fails to allege any facts tending to show that Pine Hills and Windermere are sufficiently similar such that the alleged disparity in the allocation of personnel and resources would amount to differential treatment of similarly situated neighborhoods.

Most importantly, the SAC fails to identify the "heightened security and safety measures for violent crimes" that "Windermere residents enjoy" that equally situated Pine Hills residents are denied. Plaintiffs do not provide any instances where the Sheriff's Office treated Pine Hills residents less favorably than similarly situated

10

Windermere residents in the provision of law enforcement services. Specifically, Plaintiffs have not alleged any similar instances where the Sheriff's Office was conducting a murder investigation in Windermere and deployed the Aviation unit, released a description of the suspected killer to the public, and took more than 4 hours to process the crime scene.

Essentially, Plaintiffs have offered nothing more than criticisms of how the Sheriff's Office conducted its investigation in this one particular instance. They have alleged no facts to indicate that the Sheriff's Office has an official or unofficial policy of racially discriminating against Pine Hills residents by handling criminal investigations in Pine Hills any differently than criminal investigation in Windermere or anywhere else in Orange County.[9]

Accordingly, the SAC fails to plausibly allege an equal protection *Monell* claim. *Compare Salvato v. Miley*, 790 F.3d 1286, 1298 (11th Cir. 2015) (single incident where Sheriff failed to investigate constitutional violation not enough to hold Sheriff

---

[9]The conclusory allegations concerning the Sheriff's Office's allocation of personnel and resources, and failure to dispatch aviation assistance are not entitled to a presumption of truth because they are not supported by any facts based "upon information and belief," [Doc. 1, ¶¶ 57, 63]. *See Zhejiang Dushen Necktie Co. v. Blue Med, Inc.*, No. 16-24679, 2017 WL 4119604, at *6 (S.D. Fla. Sept. 18, 2017) ("[T]he *Twombly* plausibility standard ... does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the belief is based on factual information that makes the inference of culpability plausible." (alterations added; internal quotation marks and citation omitted) ). "Conclusory allegations made upon information and belief are not entitled to a presumption of truth, and allegations stated upon information and belief that do not contain any factual support fail to meet the *Twombly* standard." *Phoenix Entm't Partners, LLC v. Orlando Beer Garden, Inc.*, No. 6:616-cv-80-Orl-31DAB, 2016 WL 1567590, at *5 (M.D. Fla. Mar. 30, 2016) (quotation marks and citation omitted).

liable under 42 U.S.C. § 1983); *Corbitt v. Henry County Commission*, 2023 WL 8587257, at *2-*3 (M.D. Ala. Dec 11, 2023) (concluding complaint failed to allege *Monell* claim based on less favorable allocation of law enforcement services to black communities); *GJR Investments v. County of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998) ("Bare allegations that "other" applicants, even "all other" applicants, were treated differently do not state an equal protection claim; a complaint must attempt to show in some fashion that these "other" applicants were situated similarly to the plaintiff.*") overruled on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1262 (11th Cir. 2004) ("[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal.") *with Rivas v. Figueroa*, 2012 WL 1378161 (S.D. Fla. Apr. 20, 2012) (finding that the plaintiff had sufficiently alleged facts of a custom/policy/pattern/practice to overcome the defendants' motion to dismiss where the plaintiff alleged, "in great detail", sixteen examples of police officers using excessive force and receiving no disciplinary action); *Vasquez v. City of Miami Beach*, 895 F.Supp.2d 1275, 1278 (S.D. Fla. 2012) (thirty-eight instances of "similar enough" conduct); *J.V.M. v. Town of Palm Beach Shores*, 2017 WL 4476373 (S.D. Fla. 2017) (plaintiff alleged eleven prior instances of misconduct towards women and defendant municipality took no action);

At bottom, the SAC fails to allege any facts that would enable a basic comparison between protective service provided in Pine Hills against protective services provided in Windemere, or elsewhere in Orange County, under like circumstances.

## IV.  COUNT VI AND COUNT VII FAIL TO STATE TITLE VI CLAIMS AGAINST SHERIFF MINA

Section 601 of Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Civil Rights Act of 1964 § 601, 42 U.S.C. § 2000d. "Title VI …, like the Fourteenth Amendment, bars only intentional discrimination." *Elston v. Talladega Cnty. Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir.1993). "Title VI … provides no more protection than the equal protection clause—both provisions bar only intentional discrimination." *Id.* at 1405 n. 11; *Alexander v. Sandoval*, 532 U.S. 275, 280 ("§ 601 prohibits only intentional discrimination.").

Here, Plaintiff has failed to allege any non-conclusory facts that plausibly create an inference of intentional discrimination. There are no factual allegations concerning policies or actions of the Sheriff's Office that demonstrate public funds are intentionally spent in a manner that discriminates among protected classes. There are no allegations of a history of discriminatory official actions, or procedural and substantive departures from the norms generally followed by the Sheriff's Office.

Nor are there any allegations pertaining to the historical background or context of the decisions at issue here.

Regarding the events of February 2, 2023, Plaintiffs allege that the Sheriff's Office did not deploy the Aviation unit, did not release a description of the suspected killer to the public, and took only 4 hours to process the crime scene before opening it back up to the public. But Plaintiffs have not alleged any facts to show that this amounts to differential treatment, much less intentional racial discrimination. Accordingly, Count VI and Count VII fail to state Title VII claims for intentional racial discrimination. *See Burton v. City of Belle Glade*, 178 F.3d 1175 1189 (11th Cir. 1999) (discussing ways of showing discriminatory purpose of government decision or act); *Corbitt v. Henry County Commission*, 2023 WL 8587257, at *6 (M.D. Ala. Dec. 11, 2023) (concluding that complaint failed to allege any facts that plausibly create an inference of intentional discrimination that alleged only that the department (1) failed to timely dispatch law enforcement, (2) failed to follow-up with phone call, and (3) has historically neglected providing racially equal emergency medical services to African-American communities in the county); *Saunders v. City of Lakeland*, 2024 WL 2815642, *5 (M.D. Fla. Jun. 3, 2024 (summarily dismissing Title VI claim and citing *Elston v. Talladega Cnty. Bd. of Educ.*, 997 F.2d 1394, 1405 n.11 (11th Cir. 1993) (declining to discuss the plaintiffs'

Title VI claims separately from the equal protection claims because the discussion would "duplicate exactly" the equal protection analysis).

## V.    COUNT V FAILS TO STATE A CLAIM FOR NEGLIGENCE

### a.  Sheriff Mina Owed no Tort Duty to Lyons

A negligence claim under Florida law has four elements that must be proved: (1) the existence of a duty of care, (2) breach of that duty, (3) legal or proximate causation, and (4) actual damages. *Wallace v. Dean*, 3 So.3d 1035, 1044, 1046 n. 18 (Fla. 2009). "[F]or there to be governmental tort liability, there must be either an underlying common law or statutory duty of care with respect to the alleged negligent conduct." *Trianon Park Condo. Ass'n v. City of Hialeah*, 468 So.2d 912, 917 (Fla.1985). Whether any duty in tort exists is a question of law. *McCain v. Fla. Power Corp.*, 593 So.2d 500 (Fla.1992).

The Sheriff's Office's "duty to protect the citizens is a general duty owed to the public as a whole." *Everton v. Willard*, 468 So.2d 936, (Fla. 1985). "The victim of a criminal offense, which might have been prevented through reasonable law enforcement action, does not establish a common law duty of care to the individual citizen and resulting tort liability, absent a special duty to the victim." *Id.*

> A special tort duty does arise when law enforcement officers become directly involved in circumstances which place people within a "zone of risk" by creating or permitting dangers to exist, by taking persons into police custody, detaining them, or otherwise subjecting them to danger … The premise underlying this theory is that a police officer's decision to assume control over a particular situation or individual or

group of individuals is accompanied by a corresponding duty to exercise reasonable care.

*Pollock*, 882 So.2d 928, 935 (Fla. 2004). However, *[w]here police officers ... have not arrived on the scene or assumed any degree of control over the situation, the "zone of risk" analysis has no application. Id.* (emphasis added).

The special duty exception has been applied in those instances where the police officers were on the scene and took control of the situation or involved situations where the police officers created the zone of risk by their actions. *See Henderson v. Bowden*, 737 So.2d 532, 536 (Fla. 1999) (holding there was a duty of care arising from a police officer's act of instructing an intoxicated man to drive to a convenience store and call for a ride home where the driver continued on and subsequently collided with a tree killing two passengers in the vehicle); *Kaisner v. Kolb*, 543 So.2d 732, 734 (Fla. 1989) (police officer owed duty of care to detained motorist who was ordered to stand dangerously close to onrushing traffic and was struck); *Labance v. Dawsy*, 14 So.3d 1256, 1259 (Fla. 5th DCA 2009) (duty of care owed to occupants of residence by police officers executing search warrant where subject was known to be armed and dangerous and shootout ensued); *Sams v. Oelrich*, 717 So.2d 1044, 1047 (Fla. 1st DCA 1998) (deputy owed duty to innocent persons in hospital emergency room from young arrestee with minor injuries and prior escape attempts); *White v. City of Waldo*, 659 So.2d 707, 710 (Fla. 1st DCA 1995) (finding a duty of

care arising from police officer's act of chasing a loose horse in a patrol car with no lights on and a private citizen on the hood).

The SAC alleges the Sheriff's Office, by releasing a public statement concerning the shooting, "triggered an affirmative duty to protect new reporters who responded to the scene." The SAC further alleges this tort duty could have been satisfied by barricading or restricting access to the "area where the shooting occurred until the shooter was apprehended, or the area was safe." On these facts, the zone of risk theory has no applicability. The risk of harm was inherently with Moses, who remained at large and had no direct contact with any Sheriff's Office deputy prior to his encounter with Lyons. Lyons likewise did not have any direct contact with any deputies. Lyon's situation was like every other civilian who happened to be in the area or passing through the area where Moses was at large. On these facts, the Sheriff's Office did not create a zone of risk, giving rise to an actionable duty of care to protect Lyons. See *Pollock*, 882 So.2d at 935 ("[w]here police officers … have not … assumed any degree of control over the situation, the "zone of risk" analysis has no application."); *Bauer as next friend of E.B. v. Chronister*, 618 F.Supp.3d 1334, 1344 (M.D. Fla. 2022) (Sherrif's Office owed no duty under zone of risk theory to murdered wife to protect her from violent husband where Sheriff's Office had not assumed control by arresting husband or arrived on any scene.).

> **b. Sheriff Mina's Decision to Remove Law Enforcement Resources from the Scene of the Shooting is protected by Sovereign Immunity**

17

"When a state or its subsidiary is sued in negligence, a court should first determine whether the circumstances alleged would subject a private person to liability under Florida law." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1262 (11th Cir. 2001) (citing *Kaisner v. Kolb*, 543 So. 2d 732, 734 (Fla. 1989)). If a court is satisfied that a duty of care was owed to the plaintiff, the court must then "determine whether the challenged actions are nonetheless acts which required the exercise of basic governmental discretion, as opposed to the implementation of an already established policy." *Id.* In other words, "even if a plaintiff has adequately alleged all of the elements of a negligence claim, including the breach of a common law duty, immunity would still bar the claim if the challenged act were deemed to be governmentally 'discretionary' in nature, and not merely 'operational.' " *Id.* at 1262–63 (quoting *Kaisner*, 543 So. 2d at 737). Under Florida law, a discretionary function is one in which "the governmental act in question involved an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning." *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1117–18 (11th Cir. 2005) (quoting *Henderson v. Bowden*, 737 So. 2d 532, 538 (Fla. 1999)) (internal quotation marks omitted). An operational function, conversely, is "one not necessary to or inherent in policy or planning, that merely reflects a

secondary decision as to how those policies or plans will be implemented." *Id.* at 1118 (quoting *Henderson*, 737 So.2d at 538) (quotation marks omitted).

In this case, all of the conduct forming the basis of Lyons' negligence claim are non-actionable on sovereign immunity grounds. The Sheriff's Office's decision to "release[] information relating to [criminal activity] to local news stations" is so obviously fundamental to the effective functioning of any local law enforcement agency such that intervention by way of tort law would entangle the courts in fundamental questions of policy and planning. And the Sheriff's Office's decisions about when to conclude a crime scene investigation and when to allow the public to access the area directly relates to fundamental and strategic decisions of the Sheriff's Office about when and how to allocate limited resources. *See Sanchez v. Miami–Dade County*, 245 So.3d 933, 941 n. 3 (Fla. 3d DCA 2018) (Florida courts "have long held that a municipality's decision on where to allocate its police resources is a planning level decision that is not subject to civil liability.") (collecting cases).

## VI.    COUNT VIII FAILS TO STATE TORT CLAIMS UNDER FLORIDA LAW

Turner asserts two claims of negligence which employ language consistent with both a special relationship theory and an undertaker theory. Both fail for the following reasons.

The following elements must be pled and proved to establish a special relationship between law enforcement and the tort victim:

1) an express promise or assurance of assistance;

2) justifiable reliance on the promise or assurance of assistance; and,

3) harm suffered because of the reliance upon the express promise or assurance of assistance.

*Pierre v. Jenne*, 795 So. 2d 1062, 1064 (Fla. 4th DCA 2001); *accord Jordan v. Nienhuis*, 203 So. 3d 974, 977 (Fla. 5th DCA 2016).

Under Florida law, the undertaker doctrine is defined as follows:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm,

or

(b) the harm is suffered because of the other's reliance upon the undertaking.

*Wallace v. Dean*, 3 So.3d 1035, 1051 (Fla. 2009) (quoting section 323 of the Restatement (Second) of Torts (1965)).

In this case, Plaintiffs have not alleged an "express promise or assurance *of assistance*" as required under the special relationship theory. The SAC merely alleges that Deputy Keyes told Turner that "Everything is under control" when she asked him why there was a police presence in the area. Notwithstanding Plaintiffs' characterization of Deputy Keyes' response as a "promise" and "assurance," the

20

statements made by Deputy Keyes fall far short of the kind statements of assurance given by public safety officials that give rise to an actionable duty of care. Deputy Keyes did not offer to take any affirmative acts to ensure Turner or Major's personal safety. Nor did he agree to take any affirmative step to ensure the safety of her house. *Compare Pierre v. Jenne*, 795 So. 2d at 1064 (affirming dismissal of negligence claim where there was no express promise or assurance of assistance made by the 911 operators) *with Hartley v. Floyd*, 512 So.2d 1022 (Fla. 1st DCA 1987) (deputy made express promise to wife to go to the boat ramp for husband's vehicle, and to notify the Coast Guard. He failed to do either and then lied to wife telling her that husband's truck was not at the ramp causing her to refrain from checking ramp personally); *St. George v. City of Deerfield Beach*, 568 So.2d 931 (Fla. 4th DCA 1990) (reversing summary judgment where 911 operator promised to dispatch paramedics but failed to follow through resulting in victim's death).

Similarly, Plaintiffs have failed to allege that Deputy Keyes rendered any services to Turner as required by the undertaker doctrine. Plaintiffs merely allege that Deputy Keyes responded to a single unsolicited question from Turner as she drove by in her vehicle. Given these allegations, Plaintiffs have failed to allege claims of negligence against the Sheriff's Office based on Deputy Keyes' alleged conduct.

## **CONCLUSION**

For the foregoing reasons Sheriff Mina requests that the Court dismiss the SAC.

## **RULE 3.01(g) CERTIFICATION**

I certify that on April 28, 2025, I conferred with opposing counsel via email wherein Plaintiffs' counsel stated that the Amended Complaint corrected some of the deficiencies raised in the motion to dismiss the original complaint and Plaintiffs' counsel believes that the other issues raised in the motion to dismiss the original complaint and now raised again in the instant motion are better suited for resolution in a motion for summary judgment.

I further certify that on October 20, 2025, after review of the Second Amended Complaint, an email was sent to Plaintiffs' counsel remarking that the Second Amended Complaint appeared to be substantially similar to the Amended Complaint and that the Defendants' arguments for dismissal are likewise substantially similar to the arguments raised in response to the Amended Complaint and inquired as to whether further conference to resolve the issues raised in this motion would be necessary.

Defendants counsel will supplement this certification upon further conferral with Plaintiffs' counsel.

*s/ Brian F. Moes*
BRIAN F. MOES, ESQ.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 20th day of October, 2025, I electronically

filed the foregoing with the Clerk of the Court by using the CM/ECF system which

will send a notice of electronic filing to the following: DeLayne D. Penland, Esq.,

delayne@nejamelaw.com, Mark E. NeJame, Esq., mark@nejamelaw.com, Ryan J.

Vescio, Esq., *ryan@nejamelaw.com, pi@nejamelaw.com*, NeJame Law, P.A., 111

North Orange Avenue, Suite 1300, Orlando, Florida 32801.

*s/ Brian F. Moes*
BRIAN F. MOES, ESQ.
Florida Bar No.:  39403
*moes@debevoisepoulton.com*
G. RYAN DIETRICH, ESQ.
Florida Bar No.: 1007940
*dietrich@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
1035 S. Semoran Boulevard, Suite 1010
Winter Park, Florida 32792
Telephone:  407-673-5000
Facsimile:  321-203-4304
*Attorneys for Defendant*