UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:25-cv-00252-PGM-UAM

BRANDI TURNER, individually,
As the Personal Representative for
the Estate of T'Yonna Major, and
GARY LYONS as the Personal
Representative for the Estate of
Dylan Lyons,

      Plaintiffs,

vs.

JACKSON B. KEYES, an individual,
and JOHN MINA, in his official capacity
as Sheriff of Orange County,

      Defendants.
_____/

DEPOSITION OF:

DETECTIVE BRIAN SAVELLI

DATE:          Thursday, April 2, 2026

TIME:          11:18 a.m. - 11:41 a.m.

REPORTER:     BARBARA K. PAWSON, Registered Professional
           Reporter, Florida Professional
           Reporter-Certified and Notary Public, State of
           Florida at Large.

A P P E A R A N C E S:

    RYAN J. VESCIO, ESQUIRE of
    NeJame Law, P.A.
    111 North Orange Avenue, Suite 1300
    Orlando, Florida  32801

                    On behalf of the Plaintiffs.

    BRIAN F. MOES, ESQUIRE of
    DeBevoise & Poulton, P.A.
    1035 South Semoran Boulevard, Suite 1010
    Winter Park, Florida  32792

                    On behalf of the Defendants.

I N D E X


DEPOSITION OF DETECTIVE BRIAN SAVELLI

    Direct Examination by Mr. Vescio          4
    Cross-Examination by Mr. Moes            14
    Redirect Examination by Mr. Vescio       16
    Recross-Examination by Mr. Moes          19


                        EXHIBITS

None marked

COURT REPORTER:  Raise your right hand, please.

Do you swear or affirm the testimony you will give will be the truth, the whole truth, and nothing but the truth?

MR. SAVELLI:  Yes.

DIRECT EXAMINATION

BY MR. MOES:

Q    All right.  Please introduce yourself, spell your name for us.

A    Brian Savelli, B-r-i-a-n S-a-v-e-l-l-i.

Q    And you're employed by the Orange County Sheriff's Office?

A    Yes.

Q    In what capacity?

A    A detective.

Q    Assigned to what you?

A    The homicide unit.

Q    When did you begin with OCSO?

A    July of 2007.

Q    Prior to that, did you have any prior law enforcement experience?

A    No.

Q    And what's your educational background?

A    I have a two-year degree from Valencia.

Q    Where did you go to academy?

A    Yes, at Valencia.

Q    And when did you graduate academy?

A    I started as a hired recruit from Orange County in July, and I graduated December 4th of 2007.

Q    And have you been consistently employed with the Orange County Sheriff's Office since that date?

A    Yes.

Q    Now, I assume you started off in uniform patrol?

A    Yes.

Q    And what have been your various assignments since uniform patrol?

A    Uniform patrol for five years.  I was a violent crimes detective for three years, and then I've been in homicide ever since.

Q    And when did you come to homicide?

A    January of 2016.

Q    And in the past ten years and three months, approximately how many death investigations have you been involved in, approximately?

A    As a total death investigations --

Q    Yes.

A    -- involved, I would say upward four or 500 maybe.  That's not just homicides, that's all because we do overdoses, natural deaths, suicides, things of that nature.

Q    All death investigations start the same way, is

that accurate?

A    I don't know if I would -- with a 911 call?  I don't know where --

Q    Well, I guess I mean this:  Homicide detectives are called out to scenes involving a decedent; correct?

A    Yes.

Q    And when you're arriving on the scene, you're conducting -- are you conducting the same analysis, determination of what we have here and what to do from there?

A    For the most part.  Every call is different, but for the most part.

Q    Now, we're here -- we're here concerning two incidents, both on February 22, 2023, both occurring in the area of Hialeah Street and Harrington Drive.  You're aware of why we're here, the cases that we're here on?

A    Yes.

Q    And do you have independent recollection of those scenes even prior to reviewing for this deposition?

A    Yes.

Q    And did you -- were you -- so my understanding is there's two incidents.  There is the shooting of Ms. Augustin that gets reported somewhere around 11:13 a.m., and then there are the shootings of T'Yonna Major and Dylan Lyons that comes in as a call for service at about 4 -- 16:05 p.m.  So I'm going to refer to Ms. Augustin as incident one, Mr. Lyons

and T'yonna as incident two, just so the record is clear. Okay?

A    Okay.  Got it.

Q    And any references to OCSO, we mean the Orange County Sheriff's Office.

A    Yes, sir, understood.

Q    All right.  Were you -- did you have any involvement in the investigation of incident one?

A    Yes.

Q    Tell me about that.

A    I wrote a search warrant for the car.

Q    Did you respond to the scene for incident one?

A    Yes.

Q    And my understanding is Detective Robles was the primary or lead detective on incident one?

A    Yes.

Q    Besides writing a search warrant for -- is that the vehicle where the shooting was later determined to have occurred?

A    Yes.

Q    Besides writing the search warrant for that vehicle, did you have any other investigative involvement concerning Detective Robles' case?

A    Yes.

Q    And tell me about that.

A    I later got video that corresponded with that investigation.

Q    And summarize what that video determined.

A    There was video of Keith Moses walking down the street, going into a backyard.

Q    And what street?

A    Hialeah.

Q    And do you recall -- and if you need to refer to any reports, that's fine.  Do you recall approximately what time that video captured or --

A    I'm unsure, yeah.

Q    Did you recover any other video of investigative relevance or significance?

A    I think I got a video from Harrington Drive as well.

Q    And what did that depict?

A    That was a video that kind of showed looking out at the intersection of Hialeah and Harrington.

Q    And what, if anything, was captured that was relevant to the investigation of incident one or incident two?

A    It showed that Markeith Loyd went into the backyard --

MR. MOES:  I think you misspoke.

THE WITNESS:  I'm sorry, Keith Moses.  I don't know

where that came from.

MR. VESCIO:  That's okay.

THE WITNESS:  Going into the backyard.

BY MR. VESCIO:

Q    And into what backyard?

A    I forgot the address.  It's the house right there on the corner.

Q    And that's the corner of Hialeah and --

A    And Harrington.

Q    -- and Harrington?

A    Yes, sir.

Q    And I just -- I don't remember your answer and I apologize.  Did you respond to the scene of incident one?

A    Yes.

Q    But did not interview anyone?

A    That's correct.

Q    Did you -- were you involved in any decision-making of releasing the perimeter or releasing the lockdown that was established related to incident one?

A    No.

Q    Did you have any interactions with any K9 units during the investigation of incident one?

A    Not that I recall.

Q    Did you make any decisions or did you suggest any investigative actions related to K9 tracking or suspect

tracking?

A    No.

Q    Did you -- when you arrived at incident one, what was your understanding of potential suspects?

A    My understanding was that there was an individual in the car that we had identified that was on scene giving vague information.

Q    And that's Mr. Collins?

A    I believe that's his name, yes, sir, the driver of the car.  And we didn't know about anybody else at that point.  At least I did not.

Q    At some point in time did you leave the scene of incident one?

A    Yes.

Q    And later on that afternoon, my understanding is you became involved in a separate death investigation at the same location?

A    Yes.

Q    How is it that Detective Robles was the lead on the first incident and you became the lead on the second incident?

A    We have a rotation amongst our team.

Q    And were these -- were these treated as two separate incidents for investigative purposes?

A    Yes.

Q    Why was that?

A    It was a separate incident at the time, two separate murders.

Q    And what made it separate?  Just the fact that they occurred at different times?

A    Case numbers.  There was a lengthy time in between.

Q    At some point in time -- well, were these two investigations kept -- well, that's an awful question that was about to happen.

Keith Moses was identified and taken into custody in relative -- within 30 minutes to an hour of the callout on incident two?

A    I believe so, yes, sir.

Q    At that time, did you as the lead detective have reason to believe that Moses was also involved as the perpetrator of incident one?

A    I think I did know that.

Q    And what -- what did you base that off of?

A    Probably a phone call from somebody notifying me of the incident.

Q    Okay.  At that point in time, were your investigation and Detective Robles' investigation still ran parallel, or were they combined at one point?

A    That's a weird question.

Q    Tell me why.

A    Because it's the same person and there was some evidence and some -- there was some evidence that was linked to the two cases.

Q    Now, at any point in time did you have a discussion with Corporal Jackson Keyes?

A    I imagine I might have.  I don't have any recollection of that conversation.

Q    Did you notate that conversation -- if the conversation occurred, did you make any notes of that, provide it in any investigative reports?

A    I don't believe so.

Q    Do you know whether Corporal Keyes was involved in the callout or investigation of incident one or incident two?

A    I know now.

Q    And what do you know his involvement to be?

A    I know from meeting with Mr. Moes that there was some --

MR. MOES:  Hold on.  We're going to protect against that disclosure.

MR. VESCIO:  That's okay.

BY MR. VESCIO:

Q    That's -- your conversations as an agency are --

A    Oh, I see.

Q    -- protected by privilege.  But at the time you had no awareness?

A   Yeah, I don't have any independent recollection of my conversations with him.

Q   Within investigation two, at any point did you utilize or request K9 resources to be used?

A   I personally?

Q   Yes.

A   On either incident?

Q   Correct.

A   I don't believe so.

Q   And why -- why not?

A   What would they be used for?

Q   So were you aware within incident one that there was three alleged people in the vehicle being Nathacha that was deceased, Collins who was arguably evasive but at the scene, and there was some other young black male described?

A   I later learned that, yes, sir.

Q   When did you first learn that?

A   I'm unsure of the exact time.

Q   Would it have been the day, February 22, or would that have been later after the day of the incident?

A   No, obviously it would have been later -- it would have been that day because then incident two happened and we knew that at the time and that I didn't believe -- his warrant was written on the 22nd, so I became aware of it that day, I just don't know the exact time.

Q    Fair enough.  As part of your investigation, did you have any discussions with -- as part of your investigation or your involvement in incident one or two, did you have any conversations with K9 Deputy Rene Davila?

A    Not that I recall.

Q    Any that you noted?

A    No, sir.

MR. VESCIO:  I don't have any other questions.

MR. MOES:  Just a few for you.

CROSS-EXAMINATION

BY MR. MOES:

Q    So you spoke to video of Keith Moses, a person later identified as Keith Moses walking down the street.  You mean Hialeah?

A    Yes, sir.

Q    And the video that depicts Keith Moses walking down the street, where is that video from?

A    I believe it's from, if I remember correctly, 1717 Hialeah and maybe 1649.  Those are the two addresses that come to mind.

Q    1717 Hialeah?

A    Yes, sir.

Q    And the second?

A    I believe it's 1649, if I'm not mistaken.

Q    What did the video from 1711 Hialeah depict?

A    I believe that's the one just right next to the house that he went in the backyard, and it shows him walking down.

Q    Hialeah, do you know if it runs east-south -- or east-west, north-south, do you know?

A    I'm not sure.  The neighborhood's kind of weird. I'm unsure.

Q    1649 Hialeah, what does that video show?

A    That video shows, I believe, Nathacha Augustin -- I think I mispronounced her name -- shows the video traveling down the road.

Q    Were you able to determine the most likely point along Hialeah that Keith Moses exited from the car being driven by Calvin Collins?

A    Between those two addresses.

Q    And do you recall where Calvin Collins brought the vehicle to his -- his vehicle to a stop following the shooting?

A    I don't recall the exact address, but it was past Harrington on Hialeah.

Q    Do you have an idea or did you take notice of how many houses there were between 1649 and the point where Calvin Collins brought his vehicle to a stop?

A    I want to say it's about seven to eight, including an intersection, so those are the total number of houses also

including an intersection you have to walk through.

Q    So you determined upon your investigation and viewing of the video that more likely than not Keith Moses left from the Calvin Collins' vehicle seven to eight houses from the point where Collins brought his vehicle to a stop?

MR. VESCIO:  I'm gonna object to the form of that question.  It's misstating previous testimony.

But you can answer.

THE WITNESS:  Yes, that's my recollection.

MR. MOES:  Okay.  Thank you.

REDIRECT EXAMINATION

BY MR. VESCIO:

Q    What was it about these videos that led to your determination that Moses would have exited the vehicle between 1649 and 1717?

A    Can I look at my report real fast?  I just want to make sure I have the right addresses.

Q    Absolutely.  Absolutely.  And, Detective Savelli, feel free to use your report, refer to your report.

A    Yeah, it's -- so it's the fact that in one video you see the car driving and you don't see anybody on foot. And then at the second address, you see both the car and Keith Moses walking on foot.  So if Keith Moses got out of that car at the other address, you surely would have seen him walking by.  And that house where you see the car driving by

without Keith Moses walking is a constant video recording system within a DVR that we actually physically collected, so it's not motion activated.

Q    So I understand, in the first video, are there three occupants depicted within that video?

A    You can't see the occupants in that car.

Q    At all?

A    As it's driving, yes, sir.

Q    So at this fixed location at 1649, the vehicle passes, somebody looking like Keith Moses doesn't pass that camera; correct?

A    Yes.

Q    Is it fair to assume, then, that Moses would have had to exit the vehicle between 1649 and when he's depicted at the 1717 address?

A    I think that's the right address, but that is correct.  That's the inference that I made from the two.

Q    I'm not taking any, you know, dispute with that, but are you able to -- if there's eight houses and an intersection, are you able to determine he got out at house one, two, three, four, five, six, seven or eight?

A    No.  So the eight house reference is only to where Calvin comes to a complete stop.  It's a shorter distance between the two with the video surveillance.

Q    How far is that?

A    If I'm putting a house number on it, I would say three to four.

Q    And there's no other video to show exactly, in fairness, whether Keith Moses was in the vehicle?

A    Correct.

Q    And if Keith Moses was in the vehicle, there's no other evidence to establish at what point he got out?

A    That is correct.

Q    Now, the video -- did you say there was video recovered where the vehicle came to a stop?

A    I don't know.  There's other video along Hialeah. I just can't recall if it -- if it captured where it came to a stop.  I want to say no, but I'm not willing to commit to that.

Q    The 1717 address where video was --

MR. MOES:  1711.

BY MR. VESCIO:

Q    Or 1711, excuse me.  The 1711 address, what type of camera system was that?

A    It was -- I believe it was a Ring or something like that, doorbell camera.

Q    So non-DVR continuously running camera?

A    Correct.

Q    And based upon your investigation and experience as a law enforcement officer, those types of cameras are motion

activated?

A    Yes.

Q    And that type of camera, prior to whatever activated it, would not have been recording whatever was in its field of view before motion activation?

A    Say that again.

Q    Yeah.  So this type of camera system at 1711 is motion activated?

A    Yes.

Q    Did you recover any video from prior to that camera activating on the date and time of this incident?

A    No.

Q    Okay.  So we don't know what happened to trigger the camera, other than some sort of motion by something?

A    I can make an assumption.  I don't know for a fact. But I did review other clips before on her phone.  She allowed me to look at her phone and we did not see anything noteworthy until the video that I collected.

MR. VESCIO:  I don't have any other follow-ups.

RECROSS-EXAMINATION

BY MR. MOES:

Q    So who did you collect the video from at the home, 1649?

A    Can I get her name from my report?

Q    Absolutely.

MR. VESCIO: Yeah, and just feel free to refer to it as needed.

THE WITNESS: Okay. I believe I've been saying 1649, but I actually believe it's 1619.

MR. MOES: Thank you.

THE WITNESS: Kerene, K-e-r-e-n-e, Poyser, P-o-y-s-e-r, and I'm referring to page 15 of 41 of my report under the witness block.

BY MR. MOES:

Q    And did you determine whether she was at home and present at her house at the time of the Nathacha Augustin shooting?

A    I'm gonna flip to that, too.

Q    Yeah, please.

A    I don't have it documented in here, but I don't believe she was, is my recollection.

Q    So when did we acquire the video from 1619 Hialeah?

A    1619?

Q    Yes.

A    I believe I got that on -- I believe I got that on the 22nd, the next day.

Q    The shooting happened on the 22nd.

A    I'm sorry, the 27th, I believe.

Q    February 27?

A    I'm looking now.

Q    Take your time.

A    Yeah.  So I don't have a date here, but I -- I basically took the DVR.  I did an audio recording with her as well as -- that would have the date, but I don't think I have it notated here, but I believe it was either the 23rd or the 27th.

Q    Thank you.  And so the video that -- the Ring video from 1711 Hialeah, can you confirm that address, please?

A    Vinzet Scott, 1717 Hialeah Street, exact address.

Q    1717?

A    Yes, sir.  And that's page 14 that I'm looking at.

Q    And when did we acquire the Ring video from 1717 Hialeah?

A    I want to say, the way my report's written, is on February 27th is when I completed a better canvass, but like I said, I believe I got an audio recording statement from her regarding the collection, and that would be the best place to look at the exact date.

Q    Did you determine whether Vinzet Scott -- spelled V-i-n-z-e-t?

A    Yes, sir.

Q    Whether she was home at the time of the Nathacha Augustin shooting?

A    I don't know if she was home at the time.

MR. MOES:  All right.  Thank you.

MR. VESCIO:  I don't have any other follow-ups.

MR. MOES:  All right.  We will read if it is ordered.

(At 11:41 a.m., the deposition concluded.)

CERTIFICATE OF OATH

STATE OF FLORIDA:

COUNTY OF ORANGE:

I, Barbara Pawson, Registered Professional Reporter, Florida Professional Reporter, Notary Public, State of Florida, certify that DETECTIVE BRIAN SAVELLI personally appeared before me on the 2nd day of April, 2026, and was duly sworn.

_____
Barbara K. Pawson, RPR, FPR-C

BARBARA PAWSON
Notary Public
State of Florida
Comm# HH251836
Expires 4/18/2026

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA:

COUNTY OF ORANGE:

I, BARBARA K. PAWSON, Registered Professional Reporter, Florida Professional Reporter and Notary Public, certify that I was authorized to and did stenographically report the foregoing deposition of DETECTIVE BRIAN SAVELLI; that a review of the transcript was requested; and that the transcript, pages 1 through 22 is a true and complete copy of the stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the outcome of this action.

Dated this the 13th day of April, 2026.

_____
Barbara K. Pawson, RPR, FPR-C

ERRATA SHEET

**DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES**

At the time of the reading and signing of the deposition, the following changes were noted:

Page/Line          Line Change          Reason

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____
DETECTIVE BRIAN SAVELLI

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:25-cv-00252-PGM-UAM

BRANDI TURNER, individually,
As the Personal Representative for
the Estate of T'Yonna Major, and
GARY LYONS as the Personal
Representative for the Estate of
Dylan Lyons,

         Plaintiffs,

vs.

JACKSON B. KEYES, an individual,
and JOHN MINA, in his official capacity
as Sheriff of Orange County,

         Defendants.

_____

     Detective Brian Savelli
     2500 West Colonial Drive
     Orlando, Florida  32804

     The referenced transcript has been completed and awaits reading and signing.  Please arrange to stop by Brian Moes's office, DeBevoise & Poulton, to read and sign the transcript. The transcript is 26 pages long, so you should allow yourself sufficient time.  Please return the errata sheet to Pawsonreporting@gmail.com.
     Please complete by May 30, 2026.
     The original of this deposition has been forwarded to the ordering party, and your errata, once received, will be forwarded to all ordering parties as listed below.


     Thank you.

                    Barbara K. Pawson, RPR, FPR-C

cc:  Brian Moes, Esquire
     Ryan Vescio, Esquire