

# Expert Report

BRANDI TURNER, individually, and
as the Personal Representative for the
Estate of T'Yonna Major, and GARY
LYONS as the Personal Representative
for the Estate of Dylan Lyons,

Plaintiff,

## vs.

JACKSON B. KEYES, an individual,
And JOHN MINA, in his official capacity
as Sheriff of Orange County,

Defendants,

# Prepared for:

Attorney DeLayne Penland with NeJame Law Firm

# Prepared by:

Jerónimo "Jerry" Rodríguez
JR Investigative and Consulting Group
2 Pine Cone Dr., Unit 350297, Palm Coast, FL 32137

March 6, 2026

_____

## JR Investigative and Consulting Group

**<u>QUALIFICATIONS</u>**

1. I began my policing career in the summer of 1986. I was an active police officer for 35 years and recently retired from active duty.

2. Since retiring as a law enforcement officer in 2021, I have served as a private police consultant, reviewing and consulting on police and law enforcement practices and training numerous agencies throughout the United States.

3. Since 2018, I have conducted multiple training sessions for sworn and nonsworn public employees. Participants in this training included city, state, and tribal law enforcement officials, attorneys, and employees of various municipal insurance pools. The training I have provided is detailed in my curriculum vitae (CV). However, I have provided law enforcement training and audits in the following areas:

   - Investigation of critical incidents,
   - Police use of force,
   - Car Pursuit investigations and adjudication,
   - Officer-involved shootings, use-of-lethal-force investigations,
   - Managing the Internal Affairs Investigations (Criminal and Administrative),
   - Criminal and administrative investigative practices,
   - In-custody death investigations,
   - False Imprisonment/Unlawful Detention
   - Police misconduct and discipline,
   - Investigative procedures and supervision,
   - Policy and procedure development.
   - Police involved traffic collisions, or traffic collisions influenced by police.

4. Additionally, I offer multiple yearly online video roll-call training sessions each year for law enforcement officers, commanding officers, and executive staff. The Legal & Liability Risk Management Institute provides this training.

5. The policy and procedure focus on critical law enforcement tasks and address policy issues related to the use of force, police pursuits, domestic violence, sexual harassment, external sexual misconduct, off-duty conduct, retention issues, internal affairs, supervisory practices, and the care, custody, and transport of prisoners, as well as training issues related to these critical tasks.

CASE NO.: 6:25-cv-00252-PGB-NWH, USDC MIDDLE DISTRICT OF FLORIDA ORLANDO DIVISION

6. The Critical Tasks/Generally Accepted Practices in Law Enforcement include instruction on the Use of Force, including dealing with individuals of diminished capacity, i.e., emotionally disturbed, mentally impaired, and suicidal, as well as persons with disabilities and use of electronic control devices; Internal Affairs, Search-Seizure and Arrest; Pursuit and Emergency Car Operation; Care, Custody, Control, and Restraint of Prisoners; Domestic Violence; Off-Duty Conduct; Sexual Harassment, Discrimination, and Misconduct.

7. Law enforcement personnel have attended, ranging from departments with fewer than ten sworn officers to those with thousands of officers. These training programs, which include online courses, are conducted numerous times annually throughout the United States. My CV further details my training experience.

8. During my time as an active law enforcement officer, executive staff officer, deputy police commissioner, and Chief of Investigations, I have advised cities and policing organizations on both the East and West coasts of the United States regarding police-critical incidents, criminal investigative practices, police-involved/influenced traffic collisions, use of force, both lethal and nonlethal, in-custody death investigations, police misconduct investigations (both criminal and administrative), traffic collision investigations, and adjudications. I have worked and been trained in internal affairs investigative processes and procedures, including conducting investigations, reviewing evidence, adjudicating, and documenting rationale and findings to ensure a complete investigation.

9. I worked in the Office of the Inspector General at the City of Los Angeles, where I audited all personnel complaints and use-of-force investigations conducted by the Los Angeles Police Department. I determined whether their investigative protocols, practices, findings, and penalties were in line with the department's policies and procedures. My duties included auditing for possible disparate treatment, deviations from generally accepted practices, or violations of officers' due process rights.

10. In 2004, I was assigned to the newly established Force Investigation Division within the Professional Standards Bureau of the Los Angeles Police Department. I was tasked with assisting in developing investigative protocols and procedures for the use of force within

CASE NO.: 6:25-cv-00252-PGB-NWH, USDC MIDDLE DISTRICT OF FLORIDA ORLANDO DIVISION

this new division. This division would investigate every critical use of force and in-custody death within the City of Los Angeles, including all uses of deadly force by on-or off-duty personnel within the City. This task required me to liaise with various agencies nationwide to assess the successful investigative units across multiple police agencies and incorporate their successes into our policies and procedures.

11. During this time, I responded to and assisted in the investigation of every officer involved in the use of lethal force, in-custody death, or other major critical force incidents within the City of Los Angeles.

12. Since 1996, I have been directly involved in investigating, overseeing, and adjudicating several hundred police-involved critical incidents as a police sergeant, middle manager, and executive staff officer. I have also participated in and been the architect of investigative policies and procedures that incorporate generally accepted investigative practices for various police agencies, including the Los Angeles Police Department, the Baltimore Police Department, and the San Francisco District Attorney's Office, Bureau of Independent Investigations. I also updated and, in some cases, drafted policies and procedures for agencies such as the Los Angeles Police Department, the Baltimore Police Department, and the San Francisco District Attorney's Office, regarding the handling of critical incidents.

## SPECIALIZED POLICE TRAINING

13. I am a former Police Captain of the Los Angeles Police Department. I served as a police officer in the Los Angeles Police Department for over 26 years, retiring in 2013.

14. During that period, I served as a patrol officer, field training officer, vice undercover investigator, use-of-force staff researcher, field supervisor, lieutenant, and patrol captain. I have also been involved in police training on subjects such as investigating allegations of police misconduct and police pursuits, reviewing and adjudicating officers involved in traffic collisions, officer-involved uses of force, death investigations, criminal investigations, and adjudicating police administrative incidents.

15. I also oversaw and managed the Baltimore Police Department's Professional Standards and Accountability Bureau. I was hired as the Baltimore Police Commissioner's assistant (Deputy Commissioner) to help run the agency. I was one of only three, including the Police Commissioner, who participated in high-level executive staff decision-making meetings.

16. My office (Professional Standards and Accountability) investigated and reviewed, approved, and provided adjudication recommendations to the police commissioner on the handling of all personnel complaints (criminal and administrative), lethal uses of force, in-custody death investigations, major police pursuits, accidents involving police officers, and other administrative investigations.

17. Additionally, I was tasked with serving as the spokesperson for all major uses of force and other significant allegations of criminal misconduct against members of the Baltimore Police Department. When the commissioner was away for extended periods, I served as Acting Police Commissioner.

18. Attached Exhibit 1, which lists my deposition and trial testimony.

19. Over my more than 35 years of policing, I have developed specialized training, skills, knowledge, and experience across many police practices and disciplines.

20. As a new police officer starting in late 1986, I refined my investigative skills in law enforcement. I handled numerous criminal cases as a police officer, field training officer, and Sergeant. During my tenure as a police officer, I also served in the use-of-force review section, which gave me insights into use-of-force investigations and the review process.

21. As an uninvolved supervisor, I conducted investigations for every use-of-force incident involving my subordinates. Later, as a middle manager, I reviewed and adjudicated the sergeant's investigations to ensure they were appropriate and aligned with generally accepted police practices. I not only investigated the uses of force as an uninvolved field sergeant, but I was also a lieutenant who reviewed the sergeant's investigative findings and their employees' use of force for completeness and appropriateness.

22. My specialized skills, training, experience, and knowledge are in police practices and activities such as police investigations (criminal and administrative), police-involved uses

of force (lethal and less-lethal), police pursuit investigations and adjudication, police misconduct investigations (criminal and administrative), accident review and adjudication, and criminal investigative practices.

23. My review of police enforcement practices and procedures began when I was promoted to patrol sergeant and continued throughout my tenure as a lieutenant and captain. During this time, I responded to, oversaw, directed, and reviewed many critical incidents and resulting investigations.

24. As a police officer for the Los Angeles Police Department, I worked as a staff researcher for the Use of Force Review Unit, where I gained extensive experience reviewing and analyzing uses of force. I gained management insights into the investigation, analysis, and adjudication of critical incidents within the organization, as well as experience reviewing and analyzing uses of force.

25. My experience as an Internal Affairs investigator provided me with specialized training and expertise in identifying and investigating allegations of police misconduct, both criminal and administrative, and in determining whether police actions and investigations were consistent with generally accepted practices. My ongoing training of agencies throughout the United States has given me a unique perspective, enabling me to continue engaging with various agencies and learning about their law enforcement culture, policies, procedures, practices, and investigative responsibilities. This, along with my ongoing review of leading law enforcement issues and receipt of legal updates from LLRMI and the International Association of Chiefs of Police, keeps me informed about many of the nation's law enforcement concerns.

26. While serving as the deputy police commissioner and Chief of Investigations, I also reviewed and adjudicated critical incidents involving police, including uses of force, police-involved lethal force incidents, in-custody death investigations, and accidents involving officers from my agency. This experience provided me with a comprehensive perspective on policing and investigative insights from both East and West Coast law enforcement, as well as exposure to city and county uniformed patrol functions, contrasting with the solely investigative law enforcement focus at the San Francisco

CASE NO.: 6:25-cv-00252-PGB-NWH, USDC MIDDLE DISTRICT OF FLORIDA ORLANDO DIVISION

District Attorney's Office, where I served as Chief of the sworn District Attorney Investigative unit.

27. Additionally, I was responsible for training command officers on proper internal affairs and use-of-force investigation procedures, as well as for reviewing and making adjudication recommendations in support of relevant policies, procedures, and training.

28. The body of knowledge I have been exposed to over nearly four decades, coupled with my specialized personal and professional experiences, my continued review of police agencies, my ongoing training of police investigators, supervisors, managers, and executives, and my ongoing interaction with other police professionals and organizations, has contributed to the foundation for the opinions I am rendering in this matter. Examining the factors involved in this incident embodies the fundamentals I apply in my professional examination of all incidents.

29. Later, as the Chief of Investigations for the San Francisco District Attorney's Office, I oversaw 40 sworn law enforcement investigators. My office was responsible for initiating criminal investigations at the direction of the District Attorney and/or conducting investigative follow-up to prepare cases for trial. I reported directly to the District Attorney, whom I consulted and advised on major investigative decisions and personnel matters. As an executive staff member in the Los Angeles Police Department, the Baltimore Police Department, and the San Francisco District Attorney's Office, I was part of the executive team, helping make high-level decisions and tasked with helping run the respective agencies. These experiences have been instrumental in developing the specialized skills, knowledge, experience, and training essential for reviewing and analyzing police practices and procedures.

30. My CV, Exhibit 2, details my experience.

**DOCUMENTS PROVIDED**

31. The list below represents the provided materials for this case.
    1. CS# 23-011822 Call 32.wav.
    2. CS# 23-011822 SC 24 Call#1.wav

CASE NO.: 6:25-cv-00252-PGB-NWH, USDC MIDDLE DISTRICT OF FLORIDA ORLANDO DIVISION

3. CS# 23-0112822 SC 26 Call #7.wav

4. CS# 23-011822 SC 29 Call #5.wav

5. CS# 23-011822 SC 30 Call #4.wav

6. CS# 23-011822 SC33 Call #3.wav

7. CS# 23-011822 SC40 Call#6.wav

8. 15 – Body_Cam_OCSO.mp4

9. 17 – Orange CSO PP Presentation 2023 Guido.pdf

10. 23-011822 Supp 011.pdf – 019.pdf

11. GO 3.1.0 – Organization

12. GO 6.2.4 – Coordinated Crime Reduction Meetings.pdf

13. GO 6.2.8 High Risk Incident.pdf

14. GO 6.2.14 Patrol Operations.pdf

15. GO 6.2.15 Patrol Procedures.pdf

16. GO 6.2.32 Active Assailant Response.pdf

17. GO 11.1.0 Call Out Notification Criteria for Specialized units.pdf

18. GO 11.1.1 – Everbridge System.pdf

19. GO 13.1.7 – Mobile Dispatch System.pdf

20. GO 14.1.0 – Media relations.pdf

21. Case # 23-011822 T'Yonna.pdf

22. Complaint.pdf

**METHODOLODGY**

32. The methodology I used to develop my opinions is consistent with that of other law enforcement consultants. I review the provided materials without making credibility determinations and evaluate the assumed actions of the involved officers against generally accepted practices and their policies and procedures at the appropriate time. Additionally, I utilize my specialized education, background, skills, training, knowledge, and experience to support the evaluation. Only after this process is complete can I formulate the final opinions in this report.

33. My opinions are based on the totality of my specialized skills, training, knowledge, and experience in policing. This expertise has been developed over my nearly 40 years of involvement in law enforcement, in various capacities, as a practitioner, and through my ongoing experience as an investigator, trainer, auditor, and consultant.

34. My opinions are based on my background as a police officer and trainer, my work with various instructors and other police practices experts, and a review of the provided materials. I do not make credibility determinations. I evaluate the assumed actions of the involved officers against generally accepted practices and their policies, training, and procedures at the appropriate time.

35. I begin the process by reviewing the complaint and identifying the allegations. I review the materials and consider whether I need any additional materials before forming an opinion(s). I sometimes research related topics in publications and standards, and I review model policies created by well-run professional organizations in the industry. Based on my review and analysis, I provide an opinion on whether the actions and decisions of the involved officers or deputies were consistent with generally accepted practices.

36. To determine whether the actions or decisions of an involved officer(s) are consistent with generally accepted practices, I apply the reasonable officer (or deputy) standard to put their choices into perspective and analyze them properly. A crucial fact is what the officer or deputy knew at the time they made the decision.

37. When law enforcement uses force, their actions are assessed under the reasonable officer standard. The reasonable officer (or deputy) standard assesses whether a similarly trained officer (or deputy) placed in the same scenario would reach the same or similar conclusions and take the same or similar actions. This determination must be based on what information law enforcement had or knew at the time. No matter how important the fact may be, if it was not known to the officer or deputy before taking their action, the information cannot be considered post-incident.

38. Additionally, I draw on my specialized background, skills, training, knowledge, experience, and education to support the evaluation. Only after this process is complete can I formulate the final opinions in a report.

39. My review and assessment are similar to the investigative evaluations conducted daily by law enforcement agencies nationwide. My opinions are expressed to a reasonable degree of professional probability regarding generally accepted practices in law enforcement, police activity review, police administration, adjudication, and supervision.

CASE NO.: 6:25-cv-00252-PGB-NWH, USDC MIDDLE DISTRICT OF FLORIDA ORLANDO DIVISION

40. This experience has provided me with extensive specialized training, experience, skills, and knowledge of police operations and generally accepted practices. The body of knowledge I have been exposed to over the years, coupled with my specialized personal and professional experiences, my continued review of police agencies, my ongoing training of police investigators, supervisors, managers, and executives, and my ongoing interaction with other police professionals and organizations, has contributed to the foundation for the opinions I am rendering in this matter. Examining the factors involved in this incident embodies the fundamentals I apply in my professional examination of all police practice-and-procedure incidents.

**SCOPE**

41. I was retained by Attorney DeLayne Penland, with the NeJame Law Firm.

42. I make no credibility assessments of what occurred and have not been asked to do so.

43. I was asked to provide an opinion on Deputy Keyes' handling of a murder scene in the Pine Hills area of Orlando, Florida, where he told Ms. Turner all was under control and allowed her to return home with her daughter while a murder suspect remained at large.

44. I was also asked to provide an opinion on the Orange County Sheriff's Office's overall response to the multiple murders in the Pine Hills area of Orlando, Florida, on February 23, 2023.

**SUMMARY OF EVENTS**

45. The following summary is not comprehensive but provides a general description of the events.

46. On February 23, 2023, at approximately 11:17 a.m., Orange County Sheriff's Office Deputies responded to the area of 6141 Hialeah Street in response to a reported shooting that had just occurred. Upon their arrival, they discovered a female, Ms. Nathancha Augustine (Ms. Augustine), who had been shot by a suspect who was later identified as Mr. Keith Moses (Mr. Moses).

47. According to the suspect's cousin, he (the cousin) was driving around with Ms. Augustine in his car when he saw his cousin, Mr. Moses, walking on the street. The cousin stated that he pulled over, and Mr. Moses got into his vehicle. While in the vehicle, Mr. Moses shot Ms. Augustine in the face for no known reason[1]. After the shooting, Mr. Moses exited his cousin's vehicle, still armed with the gun, and fled on foot back into the neighborhood. Orange County Fire Department paramedics and Sheriff's Deputies responded and treated Ms. Augustine, who succumbed to her gunshot wound injury.

48. The Orange County Sheriff's Office Deputies remained at the scene, conducting what became a murder investigation, and eventually cleared the crime scene approximately four hours later. They did so despite the fact that the armed murder suspect (Mr. Moses) had not been apprehended and was last seen walking away in the residential neighborhood.

49. According to Deputy Sonya Rutherford of the Orange County Sheriff's Office Incident Report, upon her arrival at Ms. Augustine's murder crime scene, she was advised to respond to Hialeah and Newton Street to establish a crime scene perimeter containment.

50. Deputy Rutherford and other deputies placed crime scene tape around the area to protect the crime scene. They also directed the media to their designated media staging area. Deputy Rutherford reported escorting nearby residents and advising them to park their vehicles outside of the secured, taped-off perimeter of the crime scene. Deputy Rutherford also reported escorting residents home to protect the crime scene.

51. Deputy Rutherford secured the perimeter for Orange County Sheriff's Homicide Detectives and Forensics, who arrived at the crime scene and carried out their murder investigation duties.

52. Deputy Rutherford was eventually permitted to leave once the murder investigation at the crime scene was finished.

---

[1] Second Amended Complaint, Case No. 6:25-cv-00252-PGB-NWH., and Orange County Sheriff's Office timeline of events released to media.

CASE NO.: 6:25-cv-00252-PGB-NWH, USDC MIDDLE DISTRICT OF FLORIDA ORLANDO DIVISION

53. At approximately 1125 hours, Deputy Rene Davila, Orange County Sheriff's Office, responded to the area of 6114 Hialeah Street in reference to an aggravated battery with a firearm (Murder crime scene of Ms. Augustine).

54. Upon arrival, Deputy Davila observed several deputies on scene as well as Fire Rescue personnel attempting life-saving measures on the victim (Ms. Agustine). Deputy Davila was informed by supervisors on scene that the victim (Ms. Augustine) had succumbed to her injuries, and deputies were standing by with a witness who was the driver of the vehicle Ms. Augustine was in when she was shot.[2]

55. According to Deputy Davila, she confirmed with Corporal Jackson Keyes that they did not believe they had a valid starting point for a K9 to track, nor did they know if there were any outstanding suspects or any suspect descriptions. This statement was made even though the suspect's cousin and the driver of the vehicle in which Ms. Augustine was a passenger had provided deputies with the suspect's name and descriptions. Deputy Davila stated in her report that she stayed at the scene in case any new information was found or obtained, which could allow her to deploy her K9 partner to actively search for the armed murder suspect who was still at large.

56. At approximately 2:00 p.m. on February 22, 2023, Ms. Brandi Turner (Ms. Turner) picked her 9-year-old daughter, Victim T'Yonna Major (T'Yonna), up from school and entered their neighborhood to return home.

57. Ms. Turner approached the neighborhood's entrance and noticed law enforcement present. Ms. Turner stopped and inquired of Deputy Keyes about the purpose of their law enforcement presence.

58. Deputy Keyes responded to Ms. Turner by stating, without further explanation, "Everything is under control."[3]

---

[2] This was reported to be the suspect's cousin, who also identified the suspect as Mr. Moses.
[3] Second Amended Complaint, Case No. 6:25-cv-00252-PGB-NWH.

59. Based on the representation from Deputy Keyes, with whom she had direct communication, Ms. Turner went home with her child, unaware that an armed killer remained at large in her neighborhood.[4]

60. The Orange County Sheriff's Office sent information to the news outlets advising them of Ms. Augustine's murder in the area of Hialeah Street.

61. Between approximately 3:49 and 4:03 p.m. Mr. Moses walked in through the backyard door of Ms. Turner's residence and entered her home. At the time, Ms. Turner and her daughter, whom she had just picked up from school, were at home.

62. Once inside Ms. Turner's home, Mr. Moses shot Victim T'Yonna. As Victim T'Yonna ran into her mother's (Ms. Turner's) arms, Mr. Moses shot Victim T'Yonna again and also struck Ms. Turner in the arm with a bullet. Ms. Turner frantically called 911 for help as Mr. Moses exited her residence.

63. Mr. Dylan Lyons (Mr. Lyons) and his cameraman, who had been instructed by their employer to report on location after Spectrum News 13 was informed by the Orange County Sheriff's Office about the earlier shooting and murder of Ms. Augustine.

64. Mr. Lyons was a passenger in the company vehicle dispatched to the murder crime scene in the Pine Hills area at Harrington Drive and Hialeah Street, while Mr. Moses was still at large in the immediate vicinity.

65. At approximately 3:59 p.m., while the murder of T'Yonna and the shooting of Ms. Turner were simultaneously occurring, Mr. Lyons' news vehicle was parked in the exact location of Ms. Augustine's shooting hours before. However, there was no sign of a crime scene investigation because Orange County Sheriff's Office deputies had cleared the area, although Mr. Moses remained armed and at large in the neighborhood.

66. Minutes after Mr. Moses departed from Ms. Turner's and T'Yonna's home, Mr. Lyons' cameraman was unloading equipment from the back of the van when Mr. Moses approached and opened fire, hitting the cameraman.

---

[4] Second Amended Complaint, Case No. 6:25-cv-00252-PGB-NWH.

CASE NO.: 6:25-cv-00252-PGB-NWH, USDC MIDDLE DISTRICT OF FLORIDA ORLANDO DIVISION

67. Mr. Moses continued shooting as he walked around to the side of the vehicle, pointed the gun at Mr. Lyons, and shot him in cold blood.

68. Despite lifesaving efforts from bystanders, Mr. Lyons died almost instantly from his injuries.[5]

69. At around 4:30 p.m., Orange County Sheriff's Office Deputies resecured the same area after the second round of murders that day. At or about that time, Mr. Moses is seen in one of the deputies' body-worn camera footage walking toward the deputies. Another deputy appears to be staring directly at Mr. Moses as he approaches the intersection of Hialeah Street and Bolling Drive, then continues walking straight toward the deputies.

70. Mr. Moses was taken into custody shortly thereafter by deputies, and a weapon that was still warm to the touch was recovered from inside his pants.[6]

**OPINIONS**

71. I was asked to provide an opinion on Deputy Keyes' handling of a murder crime scene in the Pine Hills area of Orlando, Florida, where he told Ms. Turner all was under control and allowed her to return home with her daughter while a murder suspect remained at large.

It is my opinion that Deputy Keyes should not have told Ms. Turner that all was under control, knowing an armed murderer was at large in the community and not making any effort to locate him or warn residents about the danger posed by Mr. Moses.

- According to the reviewed documents, Deputy Keys and the other deployed deputies had Mr. Moses' cousin as a primary witness to the murder of Ms. Augustine.
- Their witness was driving the car at the time Mr. Moses shot and killed Ms. Augustine.
- This witness gave a clear description of Mr. Moses, including his name, clothing details, and information about the crime he had just committed.
- The details would have included Mr. Moses's last known location and direction of travel.
- The vehicle in which the crime was committed, belonging to the witness, was also still present and available to deputies.

---

[5] Second Amended Complaint, Case No. 6:25-cv-00252-PGB-NWH.

[6] Experience has shown that a weapon that is still warn to the touch, often means that the weapon was recently fired.

CASE NO.: 6:25-cv-00252-PGB-NWH, USDC MIDDLE DISTRICT OF FLORIDA ORLANDO DIVISION

- Based on the reviewed documents, it appears to this reviewer that Deputy Keyes and the other deputies at the scene were focused on processing the murder scene but made no reported efforts to locate and apprehend this armed and highly dangerous suspect, who moments earlier had walked away and slipped back into the neighborhood.
- We know from Deputy Rene Davila's incident report that she was partnered with a K-9 and trained for such events to track and locate suspects who had fled from a crime scene.
- Deputy Keyes, in my opinion, made a tactical error by dismissing the K9 unit's capabilities and failing to allow the deputy and her K9 to track the suspect, who was reported by his cousin to have fled on foot.
- Additionally, neither Deputy Keyes nor any of the other deputies requested the use of their helicopter unit, which could have assisted in searching from above for the suspect who was reported to have walked away from the crime scene.
- I know from experience that a coordinated aerial search from above by an aviation (helicopter) unit, in addition to using a K9 Unit to attempt to track from the ground, is a good use of available resources and, more often than not, results in the apprehension of the fleeing suspect.
- According to the Orange County Sheriff's Office General Order No. 3.1.0, the *Aviation Section, commanded by a Captain, operates and maintains the agency's aircraft. These aircraft are available to assist operational units, conduct search and rescue missions, and transport other persons on a limited basis*.
- However, neither of these available (aviation assets or the K9) resources was utilized.
- Given the real and present danger posed by Mr. Moses to the community, it would have been in everyone's best interest to utilize these resources to attempt to bring this armed and dangerous person into custody before he could kill another innocent community member. However, based on the reviewed materials, that was not done.
- The deputies focused only on processing the murder crime scene, despite having a clear description and name of the suspect, which was provided by the eyewitness to the crime, his cousin.
- Experience has shown that when law enforcement learns of a violent suspect who has already murdered someone and is still armed and at large in a neighborhood, efforts must be made to apprehend the suspect and alert the community about the ongoing threat.

72. I was also asked to give an opinion on the overall response of the Orange County Sheriff's Department to the multiple murders in the Pine Hills area of Orlando, Florida, on February 23, 2023.

CASE NO.: 6:25-cv-00252-PGB-NWH, USDC MIDDLE DISTRICT OF FLORIDA ORLANDO DIVISION

It is my opinion that the Orange County Sheriff's Office was deficient and did not utilize or request available resources that could have helped in locating and apprehending the violent murder suspect who had reportedly walked away into the neighborhood.

- It is my opinion, after reviewing the provided materials, that the Orange County Sheriff's Office failed to properly handle the incident involving multiple murders committed by Mr. Moses on February 23, 2023.
- Based on the reviewed materials, the Orange County Sheriff's Office only focused on establishing a crime scene perimeter, allowing homicide investigators to conduct their investigations.
- There were no coordinated efforts to track, apprehend, or warn the community about this armed and highly dangerous murder suspect who was at large in their neighborhood.
- By properly warning the community and local news agencies about the threat posed by the armed and still-at-large murder suspect, the Spectrum News Station could have made a more informed decision about whether to send reporters into the area where the suspect was still at large.
- The Orange County Sheriff's Office had another resource to help the department the community and businesses about critical situations in the area. However, there are no reports of its use.
- According to the Orange County Sheriff's Office General Order No. 11.1.1, the *Everbridge system is a platform for public safety officials to send emergency and non-emergency messages to residential and business communities. The messages would notify residents and businesses by telephone, cellular phone, text message, and email of time-sensitive general and emergency information, and, when appropriate, solicit their assistance.*
- Given the immediate and real threat posed by Mr. Moses to the community, this system should have been used to alert residents and the business community of the dangers and advise them to shelter in place (if appropriate) as they search for the suspect, who had already taken one life.
- This platform could also have been used to gather community input from anyone who saw Mr. Moses and report it to law enforcement right away. However, based on the materials reviewed, this platform, although seemingly accessible, was not utilized.
- In Ms. Turner's case, she tried to get Deputy Keyes to provide the information that the Everbright system was supposed to share with community members. What is happening? Are we safe?
- However, instead of being truthful with her and warning her about the armed murder suspect in her neighborhood, Deputy Keyes falsely claimed that everything was under control.

- Had proper warning been given to those in the neighborhood and to Ms. Turner of the threat posed by Mr. Moses, some of the deaths that followed Ms. Augustine's death may have been prevented.
- Instead, Deputy Keyes reportedly let Ms. Turner and T'Yonna go home without an escort or warning them about the threat from Mr. Moses.
- It is my opinion that a reasonably trained officer in Deputy Keyes's position would not have responded the same way.
- For these reasons, it is my further opinion that the Orange County Sheriff's Office failed to notify Ms. Turner, T'Yonna, and the local businesses and news outlets of the dangers, especially while Mr. Moses was still armed and at large in the neighborhood.

73. At this stage in the development of this case, I am unsure whether I will use any demonstrative aids during my testimony. If I do, I will ensure they are available for review before they are used.

74. I reserve the right to supplement this report if additional information becomes available.

75. My fees for this case will be provided as an exhibit to this report.

This report was signed under penalty of perjury and executed on March 6, 2026, in Flagler County, Palm Coast, Florida.

*Jeronimo Rodriguez*
JERONIMO "Jerry" RODRIGUEZ