UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:25-cv-00252-PGM-UAM

BRANDI TURNER, individually,
As the Personal Representative for
the Estate of T'Yonna Major, and
GARY LYONS as the Personal
Representative for the Estate of
Dylan Lyons,

       Plaintiffs,

vs.

JACKSON B. KEYES, an individual,
and JOHN MINA, in his official capacity
as Sheriff of Orange County,

      Defendants.
_____/

DEPOSITION VIA ZOOM OF:

SERGEANT JACKSON KEYES

DATE:          Wednesday, April 1, 2026

TIME:          10:00 a.m. - 11:55 a.m.

REPORTER:     BARBARA K. PAWSON, Registered Professional
              Reporter, Florida Professional
              Reporter-Certified and Notary Public, State of
              Florida at Large.

A P P E A R A N C E S:

    RYAN J. VESCIO, ESQUIRE of
NeJame Law, P.A.
111 North Orange Avenue, Suite 1300
Orlando, Florida  32801

                On behalf of the Plaintiffs.

    BRIAN F. MOES, ESQUIRE of
DeBevoise & Poulton, P.A.
1035 South Semoran Boulevard, Suite 1010
Winter Park, Florida  32792

                On behalf of the Defendants.

I N D E X


DEPOSITION OF SERGEANT JACKSON KEYES

Direct Examination by Mr. Vescio                    4
Cross-Examination by Mr. Moes                     58


EXHIBITS

None marked

COURT REPORTER:  Raise your right hand, please.

Do you swear or affirm the testimony you will give will be the truth, the whole truth, and nothing but the truth?

OFFICER KEYES:  I do.

DIRECT EXAMINATION

BY MR. VESCIO:

Q   Good morning.  Good morning, Sergeant.  My name is Ryan Vescio.  I represent Brandi Turner both individually and as the personal representative of the estate of T'Yonna Major and Gary Lyons as personal representative for the estate of Dylan Lyons.  We're here for your deposition.  I won't assume anything, but -- except the fact that I'm sure in your career you have had the opportunity to be deposed a number of times in criminal cases?

A   I have.

Q   Okay.  Approximately how many times?

A   A couple dozen.  I'm not sure.

Q   Okay.  So we're here for a deposition in this civil case.  Having been a former prosecutor, I've sat there through criminal depositions as well and rules are the same, guidelines are the same.  Just if you know the answer to a question, answer the question.  If you don't, completely okay to say I don't know.  Mr. Moes is here as counsel for, I believe, you and the sheriff's office.  If at any time you

need to consult with him, that's fine. If you need a break also, I'm happy to do so.

Any questions about our process or sort of the rules of the road?

A No, I don't believe so.

Q Okay. Let's start. What is your -- what is your full name?

A Jackson Keyes.

Q And you're currently employed with the Orange County Sheriff's Office?

A Yes.

Q And what's your current assignment?

A I'm assigned to the uniform patrol division in sector 6.

Q And are you assigned as a sergeant?

A Yes.

Q What are your day-to-day responsibilities as a sergeant within uniform patrol?

A To supervise a squad of deputies that they respond to calls for service or do proactive self-initiated activity.

Q And how many -- how many deputies do you currently supervise?

A Right now I currently supervise eight.

Q And are those all -- are those all uniform patrol deputies just responding to calls for service, or are those

otherwise CID or detectives or investigators?

A    They're all uniform patrol staff.

Q    How long have you been with the Orange County Sheriff's Office?

A    Since 2015.

Q    Prior to 2015, did you work as a law enforcement officer for any other agency?

A    No.

Q    And what sort of training did you go through in order to become a sworn law enforcement officer?

A    The Florida Basic Law Enforcement Academy.

Q    And where did you attend academy?

A    At the Valencia Criminal Justice -- Criminal Justice Institute.

Q    What year?

A    2014.

Q    And how many times did you participate in that program before, in essence, graduating?

A    Just one.

Q    During your time in academy, were you ever subject to any disciplinary actions or allegations for violations of policy?

A    No.

Q    During your time in academy, were you ever alleged to have committed any sort of academic dishonesty or things

along those lines?

A   No.

Q   Do you have any other -- what is your educational experience besides academy?

A   I have a bachelor's degree from the University of Central Florida.

Q   And what was -- in what?

A   In criminal justice.

Q   When did you graduate UCF?

A   2013.

Q   During your undergraduate studies, did you have a particular focus of study, emphasis, specialized program, anything like that?

A   No.

Q   What type of courses did you take to obtain your criminal justice degree in your major?

A   Different criminal justice classes.  Yeah, I don't know, they all were essentially the same.

Q   And what -- what would those classes -- what would those classes have focused on or discussed?  Is it policy and theory?  Is it law enforcement practices?  I just -- I've never taken one so I don't -- I don't know.

A   There are general -- general law, some constitutional issues.  There were some more focused classes like sexual offenders, things like that.

Q    During your coursework at UCF, were you ever the subject of any allegations of academic dishonesty or cheating?

A    No.

Q    While at the University of Central Florida, were you ever the subject of any other investigations or allegation of violation of the student conduct or student policies and procedures?

A    No.

Q    I want to ask you about your training since you -- well, before we get to training, you stated that you began with the Orange County Sheriff's Office in 2015.  Was that as a sworn deputy?

A    Yes.

Q    And let's talk about, sort of, how you've progressed through the sheriff's office.  So in 2015, what was your rank?

A    Deputy sheriff.

Q    And where were you -- where were you assigned?

A    The first assignment was in uniform patrol in sector 2.

Q    And how long did you remain assigned in sector 2, in uniform patrol, before moving on to another assignment?

A    I was there until 2021.

Q    And what -- where did you go in 2021?

A    In 2021 I was moved to be the corporal on the tactical anti-crime unit in sector 3.

Q    Tactical anti-crime?

A    Yes, TAC.

Q    Yeah, TAC unit.  Okay.

And what was the process for you to be promoted from deputy sheriff to corporal in tac?

A    The process to become promoted was to take a written exam, and then based on the scores, then the sheriff makes promotions based on that.

Q    And what is that -- what is that written exam? What's on that written exam?

A    Questions that address both Florida state statutes and agency policy.

Q    In that corporal exam, are there any -- does that exam include hypothetical situations of, this is what you have, you have somebody barricaded in front of the house and an allegation of domestic violence history, how would you address this?  I mean, any sort of, like, practical here's the fact pattern, what would you do with it?  Is that part of the exam?

A    Yes.

Q    And explain to me what are -- give me some more background on that.  So what -- what type of questions are asked in that scenario?

MR. MOES:  So, Ryan, I believe that there is some concern for confidentiality regarding the questions that are put on these sorts of exams because the purpose of determining competency would be undermined if they were known.  But just making you aware that I'm listening cautiously to your question to determine whether or not you're eliciting a response that might reveal a question that could be put on an examination.  Fair enough?

MR. VESCIO:  Yeah, absolutely, and I completely respect if you need to raise objections, and then you and I can kind of discuss where to go from there.  Yep, I completely understand.

BY MR. VESCIO:

Q    Now, Sergeant Keyes, is -- well, your exam, your corporal exam, is that done by computer or in written form?

A    At the time it was done in written form, and then there was a section on the computer for basically essay questions.  So there was some that were multiple choice and some that were essay questions that were done on a computer. Now it's all done on the computer, but at the time it was written.

Q    What -- do you recall -- well, let me -- I'll just address it a different way.

What sort of training -- between the time in 2015 to 2021, what sort of ongoing training did you receive that

was related to responding to an active criminal investigation?

A    I don't recall the specifics of any training that was specifically about that.

Q    More generally -- more generally between 2015 and your promotion to corporal, what sort of training did you participate in overall?

A    Training regarding firearms, tactical situations, defensive tactics, vehicle operation.  I attended some classes on investigations like domestic investigations, narcotic investigations, et cetera.

Q    And just because I was having a little difficulty hearing, what sort -- prior to your promotion to corporal, what sort of training did you participate in related to investigations?

A    I attended a training class for investigating domestic crimes as well as violent crimes and narcotics.

Q    When you use the term violent crime, what type -- as a deputy sheriff with the Orange County Sheriff's Office, what sort of offenses fall under the umbrella of a violent crime?

A    Assault, battery, aggravated assault, aggravated battery, all those.

Q    These investigative trainings, were they in-house done by the sheriff -- Orange County Sheriff's Office or

through another entity?

A    They're done through another entity, through Valencia.

Q    And do you know more specifically who put those on at Valencia?

A    I can't recall the exact investigators -- I mean, the exact instructors.

Q    Is that -- were they through Valencia Criminal Justice Institute?

A    Yes, I believe so.

Q    Okay.  Do you recall what year those investigative -- you took those investigative courses?

A    I don't exactly.

Q    As a part of those courses, was there any sort of testing or evaluation?

A    Yes.  I know there is usually a test at the end of those types of classes.  I can't recall exactly if every single one of those classes had an exam.

Q    And if you -- in those courses, if you took an exam and passed it successfully, were you issued any sort of accreditation, commendation, certification?

A    Not a certification as such.  We would get a certificate just saying that we completed 40-hour training or how many hours of training it was to be kept in our record.

Q    And to your knowledge, is that information that is

sent back to the Orange County Sheriff's Office for their knowledge and review for prior -- you know, future assignments, promotions, things like that?

A    Yes.

Q    Have you ever seen your personnel record of your time at the Orange County Sheriff's Office personally?

A    I have.

Q    And based upon your review of that personnel record, does it include documentation of all trainings that you have attended including those in investigations?

A    Yes.

Q    Now, what were your day-to-day responsibilities as a corporal when you were assigned to the TAC unit?

A    To supervise the TAC squad deputies and, you know, review and report, if they're wanting time off, answering questions, and assisting them in certain operations.

Q    And when would you -- when would you assist in certain operations?  How would that come about?

A    You know, if there was a target that needed to be pulled over and I was able to do it, I would be there acting as well as the deputies.

Q    And in a typical day-to-day shift when you were a corporal in TAC, would you be in an agency vehicle, you know, I guess patrolling, for lack of a better term, Orange County or the area in which TAC operations were going about?

A    Yes.

Q    And when you -- when you say you supervised TAC agents, what was entailed in that supervision?

A    A lot of things on the administrative side, you know, and making sure their schedules were changed, reviewing reports.  And as far as operationally, if there was something that they wanted to do that wasn't safe or wasn't proper, then I would advise against it.

Q    Give me a -- can you explain what sort of operational piece would have been brought to you for review and approval from a TAC agent?

A    You mean prior to doing something or after the fact approving the report?

Q    Yeah.  So if I -- if I understood you correctly, part of your supervision as a corporal would be reviewing operational plans or, let's say, prospective approaches. There's a drug house and the agents want to go execute a search warrant on a drug house and they come to you with a plan of this is what we suggest, you know, this is how we should handle it.  Would you as a supervisor discuss that with an agent and say, yes, you should do this, or no, you shouldn't do this?

A    Yes.

Q    What other sort of operations would TAC be involved in that you as a corporal would supervise and advise other

TAC agents of, yes, we should do this, or no, we're not gonna do this?

A    Certain decisions on where a safe place to stop a suspect or apprehend a suspect would be or for us take them to jail.

Q    And during your time as corporal in TAC -- and how long -- how long were you assigned to that position as a corporal in TAC?

A    From August of 2021 to February of 2023.

Q    February of -- I'm sorry, there was an echo.

A    2023.

Q    '23.  And you're aware of the incident that this case is involving concerning the investigation of Keith Moses and the multiple homicides that he is alleged to have committed?

A    Yes.

Q    And according to the incident report of the Orange County Sheriff's Office, in OCSO Case No. 23-11822, this was an incident that occurred on February 22, 2023.  Does that sound about right?

A    Yes.

Q    At that -- on that date, my understanding is you were involved in the investigation and the initial call-out concerning an alleged shooting --

A    Yes.

Q    -- that ultimately was involving Keith Moses?

A    Yes.

Q    On that -- on that date and time, were you still assigned to the TAC unit as a corporal?

A    No.

Q    Okay.  And where -- where were you assigned at that time?

A    To the uniform patrol division in sector 3.

Q    So UPD sector, you were a corporal in uniform patrol?

A    Yes.

Q    What led to or how is it that you transferred from TAC to UPD as a corporal?

A    They were consolidating different units.  Sector 3 already had a separate unit, the COPS squad that had a similar -- similar goal, so they dissolved the TAC unit in sector 3, spread everybody else among other TAC units, but there wasn't an available spot for a corporal in any of the other TAC units, so I was administratively transferred to sector 3.

Q    And you said sector 3 had -- was it a cop unit?

A    Yeah, COPS, Community Oriented Policing Squad.

Q    And what is the -- what are the goals or the purpose of the COPS squad in sector 3?

A    I'm not sure about their exact things.  I know they

operated similarly to the way the TAC did, but I was never on the COPS one.

Q    Okay.  So as a corporal in uniform patrol division, what were your day-to-day responsibilities?

A    I would have deputies assigned under me and the sergeant assigned above me, and those deputies would respond to calls for services or conduct self-initiated activity, and I would approve reports, schedule time off, approve different, you know, training requests.  Day to day might be field questions about how to handle certain calls.

Q    When a -- when an emergency 911 call for service would come into the sheriff's office during this time period and would be a sector 3 call and dispatch, you know, assigned a unit to go to a call, would you have been assigned to go and respond directly to calls for service, as a corporal, or would that have been done through just a regular deputy?

A    It would have been done with just a regular deputy.

Q    How frequently during this -- and when I say this time period, I'm referring to February 2023, the date of this incident once you were a corporal in uniform patrol division. How frequently would you primarily respond to a call for service?

A    Very rarely would I be the primary person responding to a call for service.

Q    What would be the situations or scenarios in which

you would be the primary on a -- on an investigation?

A   If everybody else was busy and something -- and they weren't able to break and something came up on the board that needed to be taken care of, I might be the primary.

Q   And what is the -- what are the responsibilities of a primary responding deputy?

A   It sort of depends on the call.  But initially I get there and get information, identify if there is a crime, what it is, what type of crime, and then any other information that we might need to call the crime if that information is missing.

Q   And is that -- does that type of information include an attempt to identify any suspect or suspects of that alleged criminal offense?

A   Yes.

Q   And how long -- how long did you remain a corporal in uniform patrol division?

A   In sector 3 or in general?

Q   Well, let me -- yeah, I didn't ask that properly. I apologize, Sergeant.

From sector 3, from serving as a corporal in sector 3, where did you next -- what unit did you next move to?

A   My next permanent assignment was where I'm at now as a sergeant in UPD sector 6.

Q   And when did you -- when did you move to that

position?

A    In this criminal division in December.  I was promoted at the end of July and was temporarily assigned to sector 2 UPD for a few months, but that was a training and temporary status.

Q    What was the process for you to be promoted from corporal to sergeant?

A    Similar to the corporal.  There's a written exam and then there's a couple other parts of the exam where -- to test you on administrative responses, and then a spoken section, an oral section of answering questions that relate to your duties as a sergeant.

Q    How many times did you apply for promotion to sergeant before being accepted?

A    Twice.

Q    When did you first apply?

A    I first took the sergeant test in 20- -- I'm sorry, 2022.

Q    And were you -- was it ever disclosed why -- or let me just ask it this way:  Do you know why, when you first applied in 2022, you were not promoted?

A    No.

Q    When somebody applies for promotion and -- like this, from corporal to sergeant, and they're not selected, is there any feedback given, evaluation given to say, hey, you

weren't selected because of, you know, X, Y, or Z?

A    No.

Q    Informally, informally, were you ever advised by any personnel of the Orange County Sheriff's Office why you were not selected in your first application?

A    No.

Q    Now, have you ever been the subject of an internal affairs allegation or investigation during your time at the Orange County Sheriff's office?

A    Yes.

Q    And on how many occasions?

A    Only once have I been the subject of an investigation.

Q    And when did that occur?

A    2016.

Q    And at the time were you a deputy sheriff assigned to uniform patrol, sector 2?

A    Yes.

Q    And what was the -- what was the allegation that was made?

A    It was as a result of a vehicle crash, that I operated the vehicle inadequately.

Q    And was that you were operating an agency vehicle that was involved in a motor vehicle crash?

A    Yes.

Q    And were you cited, through a uniform traffic citation, for being civilly responsible for that traffic crash?

A    No.

Q    And was the complaint made by a private citizen or initiated by agency personnel?

A    I believe it was by agency personnel.

Q    During that internal affairs investigation, did you give a statement to the Orange County Sheriff's Office Internal Affairs Unit?

A    No.

Q    Has that internal affairs investigation been closed or concluded?

A    Yes.

Q    And what were the findings or the disposition of that internal affairs investigation?

A    It was -- I was sustained.

Q    I'm sorry, you were?

A    I was sustained in the complaint.  The complaint was sustained.

Q    And were there any sort of actions taken as a result of that sustained investigation?

A    Yes, I received a written reprimand as a form of discipline.

Q    And besides that one 2016 item, have you otherwise,

to your knowledge, has any other complaint, concerning your work as a law enforcement officer, been received by the Orange County Sheriff's Office?

A    I think that there have been a few complaints, but nothing that rose to the level of regarding a formal investigation.

Q    Well, is it -- is it your understanding that any internal affairs investigation becomes a criminal investigation?

A    No.

Q    Have you been involved in any other noncriminal investigations with the Orange County Sheriff's Office that have alleged violation of policy, besides the 2016?

A    I -- well, it's -- there is -- the terminology that we use for investigation is different from -- you wouldn't just get an investigation for a civil complaint unless there was some, you know, foundation for it.  So I've had another complaint regarding a vehicle crash that didn't result in a formal investigation, and I'm only personally aware of one other complaint that also didn't involve a formal investigation.

Q    And what was that complaint?

A    It was somebody that complained that they were unhappy that the suspect in their investigation wasn't physically arrested.

Q    When was that complaint made?

A    I'm not sure if it was either 2019 or 2020.

Q    And what were the circumstances associated with that matter?

A    There was -- the suspect that had allegedly committed battery was -- I would view the term he was very -- he was medically in such a bad situation that a physical arrest would have been extremely difficult and detrimental to him for a misdemeanor crime of battery, and a supervisor approved that charges be filed with the state attorney rather than a physical arrest being made.

Q    All right.  But that didn't lead to a formal internal affairs review?

A    No.

Q    Okay.  Have you ever been a named party to any civil litigation involving your work as a law enforcement officer, besides this case?

A    No.

Q    At any time have you ever been demoted from a particular position with the Orange County Sheriff's Office?

A    No.

Q    Is your licensure as a law enforcement officer valid and active as of today?

A    Yes.

Q    To your knowledge, have you ever been investigated

by the Florida Department of Law Enforcement for any allegations related to your work as a law enforcement officer?

A    Not to my knowledge.

Q    Now, I want to -- I want to move though the incident that we're here -- that this case involves.  Let me first ask you, did you conduct any preparation for this deposition?

A    Yes.

Q    And what did you do to prepare for this deposition?

A    I reviewed my body camera, several other body cameras from the scene, read the field reports associated with the case.

Q    Before conducting that review, did you -- or do you have any independent recollection of this call for service?

A    I do, yes.

Q    And before reviewing those items, what did you recall concerning this incident, or what do you remember concerning this investigation and call for service?

MR. MOES:  Objection, form.

BY MR. VESCIO:

Q    You can go ahead and answer.

MR. MOES:  You can answer the question.

THE WITNESS:  I recall receiving a call for service about somebody being shot, responding, seeing a victim,

and hearing the only witness saying that (inaudible).

COURT REPORTER:  I'm sorry, Sergeant, you echoed. You recall seeing a victim and hearing what?

THE WITNESS:  Hearing the witness talking about that he just heard a boom and then saw her like that and didn't know what happened.

BY MR. VESCIO:

Q    Anything else that you independently remembered about this call for service before reviewing body-worn camera or incident reports?

MR. MOES:  Object to the form.

You can answer.

THE WITNESS:  I remember eventually being told by the other deputy that the witness was now claiming another person had been in the car, but that he had not a great description, didn't know the guy's name, even though he claimed to be his cousin.

We looked for -- we directed deputies to canvass the area and try to find if anybody else could see -- had seen this person or if we could find a starting point for a K9 to track.  We did attempt to locate this unknown person, and I remember those results of that canvass being negative.

After that, I remember that we waited around on scene.  The only occupant of the car that was still

there was transported to central operations to talk to detectives, and then we were -- I was providing scene security until investigators, forensics, medical examiner could respond to the scene.

BY MR. VESCIO:

Q    And when you say scene security, what do you mean by that?

A    Preservation of evidence, making sure that nobody else came into the area and that all evidence that we had would be preserved and not tampered with at all by any outside forces until investigators arrived.

Q    Now, the body-worn cameras footage that you reviewed, you indicated you reviewed your own --

A    Yes.

Q    -- body-worn camera?

And how many videos did you review from your camera?

A    Just one.

Q    How many other -- how many other body-worn camera videos did you review of other responding -- or other personnel on scene?

A    Maybe two others.  I don't remember exactly. Definitely was not a lot.

Q    And do you recall whose body-worn camera footage you reviewed specifically?

A    I believe I reviewed Deputy Sahara's and maybe La'Jerrold White.

Q    And were those two deputies that you supervised as a corporal?

A    Deputy White was.  Deputy Sahara was on another squad that worked on the same shift as my squad.

Q    And did you write a narrative or supplemental statement in this case?

A    I did not.

Q    Any particular reason why you did not?

A    I didn't do anything in the investigation that was different from someone on the outside didn't have.  I didn't interview the suspect.  I wasn't the first person to see the body, so my -- any input would have been redundant.

Q    Now, on the date of this investigation, February 22, 2023, who was your supervisor?

A    Sergeant Richard Schmeltzer.

Q    Can you spell that for us?

A    I can.  S-c-h-m-e-l-t-z-e-r.

Q    Now, to your knowledge, are there specific Orange County Sheriff's Office policies or procedures concerning who would write a supplemental statement and for what purposes?

A    I'm sure there's something in there regarding it.  I don't know, off the top of my head, what the guidelines are for when a supplemental incident report would be taken.

Q    And when you -- when you decided to not write a supplemental report, did you have to clear that through your sergeant or get approval not to write, or is it pure discretion?

A    That was my discretion.

Q    Do you recall what either initial statements or supplemental statements or other investigative materials you reviewed for this deposition?

A    I reviewed Deputy Sahara's report and I reviewed Deputy Davila's report.  Other than that, I don't recall.

Q    Now, in what capacity did you respond to the scene?

A    As a supervisor.

Q    Now, how does -- to your knowledge, how does the Orange County Sheriff's Office document calls for service and what's occurring during a call for service?  How is that documented?

A    Through the CAD system, the computer-aided dispatch system from the communications center.  It's on a computer.

Q    And according to the incident history detail report of call LAW/0230531706, you're identified in that report as -- with two identifiers.  One is 111S as in Sierra, and then another is 7805.  What are those two identifications?

A    The 7805 is my employee ID number, so essentially badge number.  111S I believe would have been a reference to the terminal I was on, a/k/a my physical computer at the

time.

Q    Now from your experience -- and I'm just getting this pulled up, so give me one second.

Do you have, in your time as a deputy sheriff and a supervisor with the Orange County Sheriff's Office, had you had opportunity -- have you had opportunity to review CAD reports?

A    Yes.

Q    And when a CAD report indicates ID and then has a deputy's name and employee identification number, what is that indicating?

A    That that person is assigned to a call.

Q    In preparation for this deposition, did you have an opportunity to review the CAD report from this investigation concerning Keith Moses?

A    Yes.

Q    And based upon your review, did you find it to be accurate?

A    Yes.

Q    Now, in CAD reports, when there are various communications or notations, we're going to clear the car, T37 hears sirens, where is that information coming from?

MR. MOES:  Object to the form.  Are you referring to this CAD, Ryan?

MR. VESCIO:  I am.

MR. MOES:  Can you -- can you give us a bearing for the time?

MR. VESCIO:  Yeah, absolutely.

BY MR. VESCIO:

Q   The CAD report -- the CAD report in this particular case indicates that the initial call for service came in on February 22, 2023, at 11:13:43.  And then I want to direct your attention -- this is page 4 of the CAD report, the second line entry indicates 11:17:54 ID, and then it says C, Charlie, 33 7805, Keyes, Jackson.

MR. MOES:  Do you mind if I show him that, Ryan?

MR. VESCIO:  Absolutely.  And I can pop it on the screen also.

MR. MOES:  Are you able to see it?

THE WITNESS:  I see it.

MR. MOES:  All right.  I have it up for him.

MR. VESCIO:  Okay.  Great.

BY MR. VESCIO:

Q   So am I to understand that at 11:17:54 you, in essence, checked onto the scene or became involved in the call?

A   Yeah, I was assigned to the call in the computer. I was not on scene physically at that point.

Q   Now, do you recall when you arrived, when you specifically arrived at the scene?

A    It was several minutes after that.  I don't remember the exact time myself.  I could look it up on the CAD call.

Q    Would a CAD report indicate when particular units arrived on the scene in this case?

A    It would as long as the deputy either physically marked himself on scene in the computer or advised dispatch that they were on scene.  Sometimes it doesn't happen and so a deputy might show that they weren't on scene even though they were.

Q    What situations exist to where a deputy -- a deputy sheriff of the Orange County Sheriff's Office would not check into scene or advise dispatch they were on scene?

A    If they forgot.

Q    Now, the CAD record in this particular case that you have access to does not indicate any other involvement -- well, actually let me -- let me have -- before I go there, the indicator of C33 next to your ID number, what is that Charlie 33?

A    That was my unit assigned at the time.  The Charlie is for corporal, 33, sector 3, squad 3.  That was the call for corporal for squad 3 in sector 3.

Q    So going through the CAD report, at 11:19:42, there's an indicator back-ER with your unit assignment.  What does that back-ER indicate?

A    That is indicating that Sierra 33 backed me on the call, so they, you know, attached themselves to the call by backing me.

Q    Okay.  What does that mean, to back you?

A    They -- using -- in that system that we used at the time, on the computer, you could put to back a unit, which would mean to also be on the same call as that unit, enter the unit number, and then hit enter, and it would assign you to the call that the first unit was on.

Q    Okay.  Now, according to the CAD report, it indicates that you were noted as being on scene at 11:20:33.  Am I reading that correctly?

A    That's not on the screen yet.

Q    Yeah, it would be the bottom of page -- the last entry on page 4.

A    Yeah, I see it.

Q    Now, on page 6, there's a notation from your unit number at 11:24:01 that reads, driver of the veh is actual here.  He has been talking to the D/S.  Can you tell us what that is shorthand for or abbreviated for?

A    Sure.  I believe it would be driver of the vehicle is actually here.  There's a typo in actual.  He has been talking to the deputy sheriff.

Q    Are you aware -- and then this is noted at 11:24:01?

A    Yes.

Q    Now, would that have been information that you conveyed to dispatch affirmatively, like you actually keyed in or went on -- went on the call that this information was occurring or this action was occurring?

A    Yes.

Q    And what is the -- what's the purpose for doing that?

A    So before that, I'm not sure if it's recorded in the CAD call or not or if it was on the radio, but I know when I was responded, some of the deputies that were still with the victim were saying, we don't know who the driver is, where the driver is.  And then the deputies that were speaking to the driver informed me that that deputy -- or that person was the driver and wasn't just a passerby witness.  So I was just advising everybody, and the dispatchers specifically, that the driver was with us on the call -- on the scene.

Q    So on page -- on page 7, on page 7 there's a notation at 11:27:19 and the event code is o-n-s-c-e-n-o-k.  It indicates your unit number and then says at the scene.  Can you explain to me that entry?

A    So the onscenok indicator is typically several minutes after deputies are on a scene, the dispatchers are trained to unit check us to make sure that we are still okay

and nothing -- we're not in trouble after we've been on scene.  So that's when the unit check has been affirmatively answered, they'll put the onscenok next to you.  I don't remember the exact context for the at the scene, but I remember that, you know, watching on my body camera, saw that for some reason the dispatcher asked over the radio if I was at the scene, and so I said -- I remember answering I was, so that's where that line comes from.

Q    Now, on page 11 of the CAD report, four entries down -- and we're gonna talk about this a bit more -- it indicates 11:58:59, corporal 33, and then this notation, the perimeter for this call can be released and the lockdowns can be released.  Can you explain to me -- yeah, can you interpret that for me?

A    There had been a perimeter set up, so deputies at different locations around the scene, not the scene itself, but in the area.  And so they can be released, and there had been some schools that had put themselves on lockdown.  That suggests to them they can release that.

Q    So what -- who was the person to make that decision?

A    I don't recall specifically.  Leading up to that, I don't remember exactly saying that, and that part is not on my body-worn camera, so I can't speak accurately on exactly what factors went into that decision at that point in time.

Q    Well, are you -- were you the person, were you the agency supervisor that released the perimeter and released the lockdowns?  Did you make that decision?

A    The CAD call seems to indicate it.  Like I said, I don't specifically recall making that decision on my own.

Q    Based on your training and experience as a law enforcement officer and a supervisor at the Orange County Sheriff's Office, what factors would be evaluated before releasing a perimeter to a -- to, at this point, a homicide scene?

MR. MOES:  Object to the form.

You can answer.

THE WITNESS:  So the perimeter is typically used to, in conjunction with a K9 tracking, to attempt to keep somebody in an area so a K9 can track and look for that person.  At this point in this call, K9 wasn't going to be able to track, we had no starting point or other information, so we released that.

MR. MOES:  Ryan, when you get to a good point, can we take a break for convenience?

MR. VESCIO:  Yeah.  Can I just ask one other question?

MR. MOES:  Sure.  Yeah, by all means.  I just need to use the restroom.

MR. VESCIO:  No, no.  I understand.  And I think

it's a brief question.

BY MR. VESCIO:

Q   Had you not been the one, Sergeant Keyes, to make that determination to release the perimeter and lockdowns, who would have been the on-scene personnel or supervisor that would have made that decision, if not you?

A   There were two other sergeants and I think the lieutenant on scene at that point.  It was -- I'm not sure actually when -- if lieutenant was on scene at the point.  But both Sergeant Rougeux and Sergeant Schmeltzer were there.

MR. VESCIO:  Okay.  And that was -- and I'm fine with a break at that point.

MR. MOES:  Great.  Thanks.  All right.  Five minutes we'll will be back.  Okay?

MR. VESCIO:  Sounds good.

(At 11:01 a.m., the deposition recessed.)

BY MR. VESCIO:

Q   I want to talk to you about K9 and the use of K9 on this scene.  And you had indicated that prior to your deposition you had reviewed several statements -- or supplemental reports, excuse me, and one of those included Deputy Davila?

A   Yes.

Q   Now, it's my understanding that Deputy Rene, and it's spelled, for our court reporter, R-e-n-e, Davila,

D-a-v-i-l-a, is a deputy sheriff assigned to the K9 unit?

A    Yes.

Q    And what sort -- as of the day of this incident, what sort of training had you received on the use of K9s in law enforcement active investigations?

A    Very broad and general.  I don't think anything formal training.  Mostly just experience in the field from watching them work.

Q    And what do you mean by very broad?

A    I don't know the specifics of their training or the specifics of any science that goes into their -- of how their dog works.  I just know the dog smells and captures a smell.

Q    Now, as of the date of this incident, what sort of experience did you have with K9s being used in investigations in the field, for lack of a better term?

A    I have been on scene multiple times when the K9s are used.  I've accompanied K9s on their track before, but don't know how many times.

Q    Is there any way that you could even estimate?  One or two times, ten times, 100 times?  If you're able to.  If not --

A    How many times a K9 has been assigned to a call that I've been on?

Q    No.  How many times that you have physically been around a K9 that's being used in an active investigation.

A    Several dozen times.

Q    When you say you've accompanied K9s on tracks, what do you mean by that?

A    So when a K9 deputy uses a K9 to track, they need the capability -- or another deputy to accompany them because they're focused on the dog and controlling the dog, so we want to have somebody around if a threat should pop out.

Q    Now, I want to go through a couple of CAD entries in this particular case.  And on -- according to the CAD report, Deputy Davila was assigned a unit number K, as in kilo, 926.  Would that be an indication of a K9 unit in sector 2?

A    No.  The K9 units are countywide.  They just have squad one and they work two different squads, so the two is just indicating the second squad.

Q    Now, at 11:15:23, and this is on page 2 of the CAD report.

MR. MOES:  One minute, Ryan.  I closed out of that document.  Let me pull it back up.

MR. VESCIO:  That's okay.

MR. MOES:  Okay.  What was the time, Ryan, and page?

MR. VESCIO:  Page 2, 11:15:23.

MR. MOES:  Do you see that, Deputy?

THE WITNESS:  Yes.

BY MR. VESCIO:

Q    So this indicates the category is ID.  What does that indicate?

A    The identification of the deputy assigned to that call.

Q    So based upon your experience, is it fair -- is it accurate to say that at 11:15:23 Deputy Davila was assigned to the call?

A    Yes.

Q    Now, do you recall how many K9 units were involved in this case?

A    I believe a second K9 unit, the bloodhound handler arrived later, Deputy Keller, but as far as I know, it was just those two, Deputy Davila and Deputy -- she's Master Deputy or Deputy First Class Keller.

Q    Now, Deputy Davila, do you know what type of K9 she has?

A    Deputy Davila is a male.  I don't know the breed of this dog, whether it's a German shepherd or a Malinois or whatever else they are.

Q    Now, did you -- were you involved in or did you request K9 to come on scene?

A    I believe that he heard the radio traffic and initiated that himself.

Q    I'm just looking through this.  Just give me one

moment.

So according to page -- if you go to page 6, it indicates at 11:25:15 that Deputy Davila was on scene.  Am I interpreting that accurate?

A    Yes.

Q    Or was checked into the scene at 11:25.  And then I want to go forward a couple of pages to page 9.  So then at 11:40, there's another on scene indicator.  Actually, let me -- you know, let me take that back.  That's Deputy Keller.

Oh, I want to go to page 11.  So at 12:06:12, about halfway down the page, there's a notation with Deputy Davila's unit number, preempt, p-r-e-e-m-p-t.  What does that indicate?

A    That means that the dispatcher has moved him from this call to a different call.

Q    And who makes that decision?  In this particular case, who made that decision?

A    I'm not sure in this particular case.  I don't recall.  Typically it would be the K9 division to leave the call and go to something that he thought he could assist with.

Q    Now, as a supervising corporal on this particular scene, do you supervise or have authority to direct K9 units to do things or not do things?

A    I can request them to come to the scene, and that's

pretty much the limit.

Q But otherwise, do you direct where they search, why they search, when they search, when they leave a scene? Do you -- are you involved in that supervision?

MR. MOES: Object to the form.

You can answer the question.

THE WITNESS: No.

BY MR. VESCIO:

Q To your knowledge, was a K9 supervisor or did a K9 supervisor respond to the scene to direct K9 units?

A Not to my knowledge.

Q Now, after this incident, have you had an occasion to speak with -- after this investigation, meaning after February 22nd, did you have an opportunity to speak with Deputy Davila about this case after the investigation was concluded?

A Yes, I believe I had one conversation with him about it.

Q When was that?

A Several days later. I don't know the exact date.

Q And tell me, what was that conversation concerning?

A He was, you know, just trying to make sure that there wasn't anything that -- any starting point for him to have worked, trying to confirm that with me because he had been getting questioned from somebody else -- I'm not sure

who -- about whether or not they tracked or why they didn't track, and so he just wanted to ask me was there anything that he wasn't remembering about why he didn't track.

Q    Was anyone else present for that conversation besides you and Deputy Davila?

A    No, it was over the phone.

Q    And was this a voice conversation or text conversation?

A    A voice conversation.

Q    And was this a conversation that occurred on your agency-issued cellular telephone?

A    I believe so.

Q    What is -- what's that telephone number?

A    For my agency cell phone?

Q    Yes, sir.

A    Okay.  (407)375-3299.

Q    And was -- has that been -- was that the assigned agency cellular telephone that you had on February 22, 2023?

A    Yes.

Q    Are there -- during this time period, would there have been -- is it possible that this call would have occurred on your personal cell phone?

A    I don't believe so.  I don't think I have his number on my phone.

Q    And during this time period, what would have been

the delineation of a conversation concerning agency business on a personal phone versus an agency-issued phone?

A   You mean what would determine whether a conversation took place on a phone?

Q   Yes.

A   Usually the agency business is done on the agency phone.  There are certain people on my squad that I might communicate with informally on my personal phone, but Davila was never assigned to me, we're not socially -- we don't hang out socially, so I don't think I've ever spoken to him on my personal phone.

Q   And do you -- and I'm not asking you what it is, and I'll go off record for a moment to discuss this with Mr. Moes.  Is the -- is your personal cellular telephone number today the same number that it would have been on February 22, 2023?

A   Yes.

MR. VESCIO:  Can we go off record for a moment?

MR. MOES:  Yes.

(Discussion off the record.)

MR. VESCIO:  We'll go back on record.

BY MR. VESCIO:

Q   Now, Deputy Keyes, Sergeant -- Sergeant Davila wrote in his report, I was informed by supervisors on the scene that the victim had succumbed to their injuries.  And

then his report indicates, I then confirmed with Corporal Jackson Keyes, EID 7805.  They did not believe they had a valid starting point for a K9 to track as well as they did not know if there were any other -- or any outstanding suspects nor suspect descriptions.  I want to ask you about that.  Based upon your training and experience, what is a starting point in reference to a K9 investigation?

A    Yeah.  A starting point is a place that we know a suspect has been or stood that a K9 can go and get that subject's scent and then track to that subject.

Q    What is your experience -- do you have any training as it relates to detecting a starting point for a K9 track?

MR. MOES:  Form.

You can answer the question.

THE WITNESS:  The practice -- I'm not sure if it was received in any kind of formal training, but the practice is to try to find the most recent place that somebody has seen the suspect and in a spot where there wouldn't have been any other scent contamination to prevent the dog from tracking the wrong subject.

BY MR. VESCIO:

Q    Have you received any training as it relates to scent contamination?

A    Not formally as such.

Q    What sort of informal training have you -- have you

undertaken or been given related to scent contamination?

A    Just experience from prior calls when a deputy -- I mean a K9 deputy was unable to track with a dog because there had been too many people in the immediate area or we didn't ever know at any point which -- or are aware a suspect had been.

Q    Prior to Deputy Davila's arrival on scene, what analysis had you conducted concerning whether a starting point for a K9 track existed on this scene?

A    So initially I believe when Deputy Davila came on scene, we had no knowledge of anybody else being in the car other than the driver and the victim, so there was no -- nobody for getting that to track at all, except for, you know, if -- until we later learned of this potential third person, that was when we started thinking about, you know, where -- where could he potentially start from.  The vehicle --

Q    And when --

A    -- was not -- go ahead.

Q    And I apologize if I didn't let you --

MR. MOES:  Please finish your answer, Deputy.

MR. VESCIO:  I apologize.

THE WITNESS:  Eventually when we did learn that the driver was claiming a third person was in the car, the only place that the person -- that he knew the person to

have been was the vehicle, which had had multiple deputies and emergency medical responders walking all around it, so there would not have been a way for the K9, the dog, to identify which scent to follow.

BY MR. VESCIO:

Q    And let me -- I want to break this down into a few areas.

You indicated -- well, at least Deputy Davila indicates a conversation with you concerning the lack of a valid starting point. Why -- why would the vehicle -- well, let me ask it. Do you believe, based upon your training and experience, that the vehicle where the first victim was shot within was a starting point for a K9 track?

MR. MOES: Object to the form.

You can answer.

THE WITNESS: Once we learned that there was a claim of a third person in the car, there was no other indication from any witness that told us anywhere else that that potential third subject could have been, so the overall knowledge would have been the claim that that person had been in the car.

BY MR. VESCIO:

Q    Well, did you have any reason to believe that the shooting -- when you -- as of 11:25 when Deputy Davila responded, did you, as the on-scene supervisor, have any

information to believe that this shooting happened anywhere else besides the vehicle on scene?

A    No.

Q    So upon -- upon Deputy Davila's initial conversation with you, do you recall stating that there was no point or no place to start a K9 track?  And I mean that differently than, would it have been beneficial, what would it have yielded.  I'm just talking about a fixed location.

MR. MOES:  Can I ask you to repeat that question?

MR. VESCIO:  Yeah.

BY MR. VESCIO:

Q    As of 11:25 when Deputy Davila responded, did you believe that there was a physical location to where a K9 track could have been attempted?

A    Other than the vehicle, no.

Q    And did you have any reason to believe that this shooting occurred anywhere else than inside the vehicle?

A    No.

Q    Now, we had already -- we had already talked about the fact that Deputy Davila was cleared from the call at 12:06 according to the CAD, but I want to go back in time. And I'm gonna be referencing some items, some descriptions on the CAD report.  I'm more than happy to have you look at that.  Well, actually, before we do that, let me just go back to one other thing.

Now, I believe you testified to this, but just so that I'm clear, at 11:25 when Deputy Davila and his K9 unit arrived on scene, at that point in time there was no description of any third person other than the driver of the vehicle and the victim of the shooting?

A    Not to my knowledge, there was not.

Q    Okay.  Now, as -- as this scene and investigation is occurring, it's a shooting, are you sort of -- what are you focused on?  Are you just focused on what you're doing?  How closely do you pay attention to the radio?  I mean, how do those dynamics work as a scene supervisor?

A    Yeah.  I need to, you know, figure out what is already being done, which deputies are, you know, doing what parts of the investigation, and yeah, listening to the radio as well.

Q    Now, on page 9 of the CAD, there's an entry at 11:42:29 stating, we have X1 person outstanding from the vehicle poss, we're working on the d-e-s-c now.  Can you decipher that for me?

A    Sure.  It would just be we have one person outstanding, meaning not here at the scene, from the vehicle, we're working on a description now.

Q    Okay.  So based upon that CAD entry, is that consistent with identifying that there was a third person on this scene?

A    Identifying that the driver was -- was telling us that there was somebody else in the car.

Q    When do you recall first learning of a third person in the vehicle according to witness descriptions?

A    I don't know the exact minute, but it was, you know, a little after I got there, at least 10, 15 minutes after I arrived on scene.

Q    Now, I want to continue on that page.  It appears -- at 11:47:36, there's an entry, desc for poss third occupant of vehicle, and then there's a physical description given.  Do you see that?

A    Yes.

Q    Described as a light-skinned black male, gray shirt, approximately 5'10", muscular, with an afro, possible age is 17 to 18 years old.  So that was the description that went out at that time?

A    Yes.

Q    Now, once you learned of the potential presence of a third person on this -- on this scene, what did you do related to Deputy Davila and a potential K9 search?

A    We directed deputies to start going door to door on the street looking for any witnesses that could provide a last location for such a subject or any kind of surveillance video from a surveillance camera to try to identify a place where that subject might have been to allow K9 to perform the

track.

Q   Now, Deputy Davila indicated in his report, while on scene, the witness advised there was a third outstanding subject; however, due to the time delay as well as no known uncontaminated starting point for a K9 track, I was unable to deploy my K9 partner.  (Inaudible) did you make Deputy Davila's efforts to conduct a canine search?

MR. MOES:  I didn't hear -- there was a cutout in your question, Ryan.

BY MR. VESCIO:

Q   Yeah, I'll reask it.  Once a potential -- once the existence of a third person was identified, did you observe Deputy Davila take any efforts to conduct a K9 track?

A   Other than assisting us with trying to find any location he could start, no, I don't think the dog ever came out or anything like that.

Q   And when you say you don't think the dog ever came out, what do you mean by that?

A   I don't recall the dog ever being taken out of the vehicle.

Q   Whose decision was that?

A   Deputy Davila's.

Q   Did you have any consultation with Deputy Davila in reaching that decision?

A   I'm not sure if I advised him of the results of our

canvass or if that was somebody else, but not -- I didn't advise him on what decision to make. I don't advise K9s on what decisions to make.

Q So do you recall when you were, you know, checked out from this scene or reassigned from this scene? Do you recall?

A I don't recall the exact time. It was after everything was over.

Q So the -- now, homicide was called out to this scene?

A Yes.

Q And once homicide arrived, they're now in control of the scene and your work as a uniformed patrol division supervisor, basically does it end at that point and the scene is handed over to them?

A Yeah, then the duties just continue being scene security, providing security for the detectives and continue to prevent contamination from outside sources.

Q Now, we previously discussed the notation in the CAD report on page 11 that at 11:58:59 there's an entry of Charlie 33, the perimeter for this call can be released and lockdowns be released. And according to -- well, let me just ask you, do you know when you left this scene on the day of the incident?

A I don't know the exact time. It was sometime in

the early afternoon.

Q    Now, by the time that homicide arrived on scene, what information did you know about this incident as the scene supervisor?

A    I knew that the driver was claiming -- initially had claims to just be driving with the female victim.  As he was driving, he heard a boom and looked over and saw her with a wound and stopped.  I knew that he later added that he had picked up his cousin, who he only knew by the name Keith, and was driving around, heard the boom and saw her and didn't know what happened to his cousin.

Q    And were you -- we talked a moment ago about the description that was put out of the light-skinned black male, gray shirt, 5'10", muscular build with afro.  Were you aware -- at the time that homicide arrives, were you aware of what the description was of this potential suspect?

A    I was aware of what went over the radio, yeah.

Q    Do you -- do you recall coming in contact with Brandi Turner on the day of this incident?

A    I don't.

Q    Had you come in contact with Brandi Turner on the day of this incident, would that have been a reason for you to execute a supplemental statement, or a supplemental report?

A    No.

Q    Do you recall -- and there are just some questions I have to ask you even though the answer may be apparent.  Do you recall having a conversation with Brandi Turner at or about 12:15 p.m. on the date of this incident?

A    I do not.

Q    Do you recall advising Brandi Turner that everything was under control at the scene?

A    I do not.

Q    Do you recall or do you know where Brandi Turner resided on the date of this incident relative to the scene?

A    I do not.

Q    Do you recall anyone, any civilian approaching you on the day of the incident while you were on the scene asking about, hey, what's going on, what happened, anything along those lines?

A    I don't recall, no.

Q    Based upon your review of your body-worn camera footage, did your body-worn camera footage capture any conversation with a civilian about the scene, what happened, or anything along those lines?

A    No.

Q    Now, how is your body-worn camera activated?  On this date, how would it have been activated?  Is it done automatically or is it done manually?

A    Manually.

Q    And is there Orange County Sheriff's Office policy concerning the activation and use of body-worn cameras for deputies?

A    Yes.

Q    And what is your knowledge of that policy as it relates to interactions with civilians while on a crime scene?

A    It should be activated during interviewing suspects or interviewing victims as long as they can -- will consent to being recorded during that.  As far as a random civilian coming up to us ask what's going on, not necessarily.

Q    Now, as a -- as a corporal, how do you define interview for purposes of activating your body-worn camera?

A    Talking to somebody about the crime that was involved in some way, a victim, witness, or suspect.

Q    And on the date of this incident, are you aware of what time you activated -- well, did you activate -- did you manually activate your body-worn camera on the date of this incident at the scene?

A    Yes.

Q    And do you recall when you activated it?

A    Not the exact time, no, but it would have been soon after I arrived.

Q    And you're aware that body-worn camera footage does have a date and timestamp on it to indicate --

A    Yes.

Q    -- when it's running?

Do you recall when you deactivated your body-worn camera?

A    Again, not the exact minute, but about ten minutes after.

Q    And why did you turn your body-worn camera off approximately ten minutes later?

A    I -- in reviewing my body-worn camera, I was trying to remember why.  I don't have a specific recollection.  It could have been that I was about to make a phone call or something that was not -- I wasn't talking to or on the theme of the victim to capture any evidence or anything like that.

Q    And based upon your training and experience, when you would deactivate your body-worn camera for that purpose, would you turn your body-worn camera back on after a call like that would have been made?

A    If I was going to reengage with any suspects or witnesses, yes.

Q    And do you recall -- well, I think I've already asked you that.  After -- after you turned off or deactivated your body-worn camera, did you -- were you still involved in the scene as a scene supervisor?

A    Yes.

Q    And at any point in time did you reactivate your

body-worn camera?

A    No.

Q    And why not?

A    Because I never spoke with the suspect again, didn't speak with any witnesses to the crime, anything that would have evidentiary value.

Q    And to your knowledge, was the third person identified by the driver alleged to have had a firearm?

A    Not to my knowledge.

Q    And at any point do you recall while on scene that day, at any point in time do you remember an allegation that a third party had a firearm that was used in the commission of this offense?

A    No.

Q    Now, were you aware that this incident involved a shooting upon your arrival?

A    Yes.

Q    Did you personally observe the victim who would become deceased on scene?

A    Yes.

Q    Based upon your training and experience, did you recognize her to be suffering or having received a gunshot wound?

A    It certainly appeared that way.

Q    Now, while on scene as the -- as the scene

supervisor, were you aware of whether a firearm was recovered from the scene during the initial investigation?

A    While I was on scene, a firearm was not recovered.

Q    And what was the -- what was the approximate size of this immediate crime scene where the shooting took place?

A    I haven't -- can't remember the exact street name, but that's actually -- I think it was Hialeah where the car had come to rest.  Both the nearest intersection to the east and the nearest intersection to the west were blocked off with -- to prevent vehicle traffic through.

Q    And I believe you answered this earlier, but I just want to make sure.  Were you aware that the shooting occurred actually inside of the vehicle that eventually came to rest?

A    It appeared that way due to the way that the scene -- to what I saw on the scene.  I believe -- I could consult the CAD screen, but I think the call just came in saying somebody -- you know, I heard a boom, somebody was shot.  So based on that information, we weren't sure initially until responding.

COURT REPORTER:  Until responding what?

THE WITNESS:  I don't remember exactly what the call said, what would identify the shot came inside the vehicle, but that was the conclusion that we reached upon actually being on scene and viewing the evidence on the scene.

BY MR. VESCIO:

Q    Is there -- do you have any other -- well, were you involved in this investigation after you left the scene on February 22, 2023?

A    I was not involved, per se.  I responded after the fact, later in the afternoon, after one of my deputies under my supervision located the eventual suspect.  I didn't do any investigation or speak to the suspect or anything else like that.

Q    How far -- how far away approximately was Keith Moses apprehended from where the vehicle stopped in the initial interview -- or initial investigation?

A    I don't recall where the actual -- what location we were at when -- when he was found.

Q    Did you conduct any other investigation into this matter other than that which we discussed here today?

A    No.

MR. VESCIO:  Thank you very much.  I don't have any other questions.

MR. MOES:  Ryan, I have just a few.

CROSS-EXAMINATION

BY MR. MOES:

Q    Deputy -- or Sergeant Keyes, did you personally interview the driver of the vehicle later identified as Calvin Collins at any time while at the scene?

A    No.

Q    Was there consideration given to whether or not Calvin Collins was responsible for this shooting of Nathacha Augustin during the preliminary investigations?

A    Yes.

Q    10:01 Did you ever determine through your on-scene investigation a starting point eligible for K9 tracking?

A    No.

Q    Did you ever determine from what point Keith Moses, who was later determined to have been the third occupant of the car, did you ever determine at which point he left from the car?

A    No.

Q    What were you told by the deputies at the scene that -- the deputies under your supervision, as to the level of cooperation of Mr. Collins, the driver of the vehicle?

Do you understand my question?

A    I understand the question.  I don't know if anybody ever made their own conclusion of the characterization of it. I don't recall that.  But I remember the information that they told me and about how vague the information sounded.

Q    When the call first came in and as you were traveling to the location of the shooting, were you informed that someone had shot into the vehicle or whether someone shot from with inside the vehicle, or was that open to

investigation -- or was that a matter open to investigation when you arrived?

A    While responding, I believe remembering it was unclear what had happened or even who was calling, if it was a third person, third-party bystander or somebody involved or if it was something that needed to be investigated.

Q    So fair to say it was not known whether an individual shot into the car or whether the shot came from within the car until some point later when you were on the scene, viewing the scene and receiving information from fellow deputies?

A    Yes.

MR. MOES:  Okay.  Thank you.  Ryan, do you have any follow up?

MR. VESCIO:  I'm just looking.

No, I don't.

MR. MOES:  All right.  Excellent.  I think we can keep the schedule today.  So if I understand -- we will read if it is ordered, Madam Court Reporter.

(At 11:55 a.m., the deposition concluded.)

CERTIFICATE OF OATH

STATE OF FLORIDA:

COUNTY OF ORANGE:

I, Barbara Pawson, Registered Professional Reporter, Florida Professional Reporter, Notary Public, State of Florida, certify that SERGEANT JACKSON KEYES appeared before me via Zoom on the 1st day of April, 2026, and was duly sworn.

_____
Barbara K. Pawson, RPR, FPR-C

BARBARA PAWSON
Notary Public
State of Florida
Comm# HH251836
Expires 4/18/2026

PAWSON REPORTING, LLC
(407)849-0304

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA:

COUNTY OF ORANGE:

I, BARBARA K. PAWSON, Registered Professional Reporter, Florida Professional Reporter and Notary Public, certify that I was authorized to and did stenographically report the foregoing deposition via Zoom of SERGEANT JACKSON KEYES; that a review of the transcript was requested; and that the transcript, pages 1 through 60 is a true and complete copy of the stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the outcome of this action.

Dated this the 13th day of April, 2026.

_____
Barbara K. Pawson, RPR, FPR-C

ERRATA SHEET

**DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES**


    At the time of the reading and signing of the

deposition, the following changes were noted:

        Page/Line          Line Change          Reason

        _____          _____

        _____          _____

        _____          _____

        _____          _____

        _____          _____

        _____          _____

        _____          _____

        _____          _____

        _____          _____

        _____          _____

        _____          _____

        _____          _____


Under penalties of perjury, I declare that I have read the
foregoing document and that the facts stated in it are true.


                        _____
                        SERGEANT JACKSON KEYES

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:25-cv-00252-PGM-UAM

BRANDI TURNER, individually,
As the Personal Representative for
the Estate of T'Yonna Major, and
GARY LYONS as the Personal
Representative for the Estate of
Dylan Lyons,

            Plaintiffs,

vs.

JACKSON B. KEYES, an individual,
and JOHN MINA, in his official capacity
as Sheriff of Orange County,

            Defendants.
_____

      Sergeant Jackson Keyes
      2500 West Colonial Drive
      Orlando, Florida  32804

      The referenced transcript has been completed and awaits reading and signing.  Please arrange to stop by Brian Moes's office, DeBevoise & Poulton, to read and sign the transcript.  The transcript is 62 pages long, so you should allow yourself sufficient time.  Please return the errata sheet to Pawsonreporting@gmail.com.
      Please complete by May 30, 2026.
      The original of this deposition has been forwarded to the ordering party, and your errata, once received, will be forwarded to all ordering parties as listed below.

      Thank you.

                 Barbara K. Pawson, RPR, FPR-C

cc:  Brian Moes, Esquire
     Ryan Vescio, Esquire