UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:25-cv-00252-PGB-NWH

BRANDI TURNER, individually, and
as the Personal Representative for the
Estate of T'Yonna Major, and GARY
LYONS as the Personal Representative
for the Estate of Dylan Lyons

   Plaintiffs,

vs.

JACKSON B. KEYES, an individual,
and JOHN MINA, in his official capacity
as Sheriff of Orange County,

   Defendants.

_____/

## DEFENDANTS JOHN MINA AND JACKSON B. KEYES' MOTION FOR SUMMARY JUDGMENT

Defendants John Mina, in his official capacity as Sheriff of Orange County, Florida, and Jackson B. Keyes, individually, through undersigned attorneys and pursuant to Fed. R. Civ. P. 56, move for summary judgment on all counts in the Second Amended Complaint.[1]

I.  **INTRODUCTION**

---

[1] Defendants' Motions to Dismiss the Second Amended Complaint are currently pending with the Court. (Docs. 40-41).

On February 22, 2023, for reasons that are still unknown, Keith Moses randomly shot five people in the Pine Hills area of Orange County, tragically killing three.[2] Among the deceased are Nathacha Augustin, Dylan Lyons, and nine-year-old T'Yonna Major, the daughter of Brandi Turner. Brandi Turner, in her own right and as the personal representative of her daughter's estate (hereafter collectively referred to as "Turner"), has sued Corporal Jackson Keyes ("Keyes") pursuant to 42 U.S.C. § 1983, asserting a Fourteenth Amendment substantive due process claim. (Counts I and II).  Keyes argues against the finding of a substantive due process violation and invokes the defense of qualified immunity.

Turner, along with Gary Lyons, as the Personal Representative of Dylan Lyons' Estate, have asserted pendant state law claims in negligence against Sheriff Mina. (Counts V and VIII).[3] Sheriff Mina asserts that no actionable tort duty of care was owed to the Plaintiffs, much less one that would not be foreclosed by sovereign immunity.

As to the remaining counts of the operative complaint, Counts II, III, VI, and VII, the parties have jointly stipulated dismissal with prejudice. (Doc. 52).

---

[2]Keith Moses has not yet been convicted of the crimes charged.

[3]The factual allegations and claims brought by Turner individually and in her capacity as the representative of T'Yonna Major's estate against the Defendants are identical. To improve readability, Defendants refer only to Turner when addressing identical claims regardless of Turner's capacity.

2

## II.   AGREED MATERIAL FACTS[4]

1.   On February 22, 2023, at approximately 11:17 am, OCSO patrol deputies responded to multiple 911 calls about a shooting in the vicinity of 6114 Hialeah Street. (Ex. 1, Det. Robles Investigative Report at 5).

2.   Responding deputies discovered a woman, later identified as Nathacha Augustin, on the ground just outside of a white Hyundai with a gunshot wound. (Ex. 1 at 5).

3.   Responding deputies and Orange County Fire Rescue rendered first aid, but Ms. Augustin was pronounced deceased on scene at 11:29 a.m. (Ex. 1 at 5).

4.   Calvin Collins was at the scene when deputies arrived, claiming to be the driver of the vehicle. (Ex. 1 at 5).

### *Statements on Bodycam Video Made by Calvin Collins at the Scene*

5.   From approximately 11:27 to 11:40 am, deputies questioned Collins at the scene. (Ex. 2, Body Cam 1).[5]

6.   Collins stated the following:

   a. Collins was the driver of the vehicle when he heard "Boom!" (Ex. 2, Bodycam 1, at 9:30-9:45).

---

[4]All of the facts in Section II are taken directly, without edits, from the parties' Joint Stipulation of Agreed Material Facts. There are no facts in Section II that are not in the Joint Stipulation.
[5]The clock in the upper right displays the current UTC time, which on February 22, 2023 was five (5) hours later that EST.

b. Collins' "little cousin" was in the car at the time but jumped out and told Collins to "Go!" (Ex. 2 at 9:45-9:53).

c. Collins started to drive away because he did not know where the shot came from. Specifically, Collins stated: "I don't know where they coming from." (Ex. 2 at 9:53-9:54).

d. Collins started to drive away but stopped once he noticed that Ms. Augustin was injured. (Ex. 2 at 9:54-10:01). [6]

e. When asked where his "little cousin" is, Collins replied: "I'm by myself" indicating that he did not know. (Ex. 2 at 10:01-10:07).

f. When asked,  "Who is your cousin to you?" Collins replied, by shrugging his shoulders and saying "I don't know." (Ex. 2 at 10:08-10:15).

g. Collins explained that as soon as he picked up his "little cousin," he started giving turn-by-turn driving directions, and then he heard a loud gunshot. (Ex. 2 at 11:00-11:30).

h. When asked, "What's your cousin's name?" Collins said, "Keith" (Ex. 4, Bodycam 2, at 17:30-17:17:37).

i. When asked "What's his last name," Collins stated that he did not know but explained that Keith is "on my dad's side," and further stated that Keith's dad's last name is "Moses." (Ex. 4 at 17:40-17:55).

j. Collins did not know Keith's date of birth but thought he was around 17 or 18 years old. (Ex. 3 at 17:55-18:07). Collins described him as 5'10", light-skinned, and wearing a grey shirt.  (Ex. 4 at 18:10-19:30).

---

[6]Based on security camera video recovered from several homes along Hialeah St., Det. Savelli determined that Moses most likely exited the Hyundai between 1649 and 1717 Hialeah St, or 7 to 8 doors down from where Collins brought the Hyundai to a stop. (Ex. 3, Savelli Depo Transcript, at 15:12 – 18:022

7.      After questioning Collins, Deputy Louis Tejera Jr. stated: "I'm not sure if the whole cousin thing is real." (Ex. 4 at 19:30-20:15).

8.      Deputy Tejera hypothesized that because there were no bullet holes or broken windows, the shot came from inside the vehicle. (Ex. 4 at 20:15-20:27).

### *Criminal Investigation Details Known to Keyes Prior to the Encounter with Turner at 12:15 pm*

9.      Keyes arrived on scene at approximately 11:20 am and performed duties of a scene supervisor. (Ex. 5, Deposition of Keyes, 28:11-12, 30:19 – 31:02).

10.     At 11:40 am, immediately following the initial questioning of Collins, Keyes approached Deputy Tejera and asked if Collins said there was another person in the car. Deputy Tejera confirmed that Collins said there was another person in the vehicle, whom Collins referred to as his cousin. Keyes then asked Deputy Tejera if there was a description of the third person, and if he knew where the third person went. Deputy Tejera relayed the physical description given by Collins and told Keyes that the third person was named Keith. (Ex. 4 at 20:30 – 20:54; Ex. 5 at 49:03-17).

11.     Keyes then directed deputies to canvass the area to locate (1) potential witnesses, (2) the third person described by Collins, and (3) possible "staring points" for a K9 unit to track the third person. (Ex. 5 at 25:08-23, 49:18 - 01).[7]

### K9 Deputies Arrive on Scene

12.     K9 Deputy Rene Davila arrived on scene at 11:25 am as Fire Rescue and fellow deputies were rendering emergency aid to Ms. Augustin. (Ex. 6, Davila Incident Report; Ex. 5 at 40:02-05). Deputy Davilla remained on scene as the investigation unfolded.

13.     Later, when Collins revealed that there was a third person (Keith) in the car, Davila determined that "due to the time delay as well as no known uncontaminated starting point for a K9 track, [he] was unable to deploy [his] K9 partner." (Ex. 6; Ex. 5 at 45:07 – 46:21, 47:12-15).

14.     At 11:40, K9 Deputy Angela Keller arrived on scene. At 11:48 am she went to 5914 Harrington Dr. (Turner's residence) and attempted to make contact by knocking on the front door. (Ex. 7, Ring Video – Canvassing; Ex. 8, Turner Deposition Transcript 2, at 08:09-18; Ex. 9, Keller Incident Report). Deputy Keller determined that "the scene was heavily contaminated with multiple deputies, fire rescue and citizens eliminating a starting point. A direction of travel for the potential

---

[7] After receiving an automated notification on his cell phone, Turner's husband, Tokiyo Major called Turner and told her that the Ring camera was activated by a police officer coming to the front door. (Ex. 7 at 08:19 – 09:06).

6

suspect was also unknown." Therefore, Deputy Keller did not deploy her K9 partner. (Ex. 9).

### Brandi Turner's Encounter with a Deputy at 12:15 pm

15.     At 12:15 pm, Brandi Turner arrived home. (Ex. 8, Turner Deposition Transcript 2, at 12:06-16;  Ex. 10, Ring Camera - Turner Arrives at Home).

16.     As Turner was approaching her house, she noticed approximately six parked police vehicles. (Ex. 8 at 35:11-16). ). At the corner of Hialeah St. and Harrington Dr., (two houses down from Turner's house), Turner stopped her vehicle and asked an OCSO deputy standing at the corner: "Is everything okay around here?" (Ex. 8 at 38:10 – 39:25).

17.     Keyes allegedly responded: "Everything [is] under control," "just keep going." (Ex. 8 at 41:10-22). [8]

### The Nathacha Augustin Homicide Investigation

18.     At 12:06 pm, Collins was taken into custody (Ex. 11, Collins In-Custody Interview Transcripts, 13:11 – 14:04) and transported to OCSO Central Operations for further questioning. (Ex. 12, Bodycam of Collins Transport; Ex. 9, Transcript of Collins Interview, at 13:11 – 14:19).

---

[8] Keyes has no recollection of the encounter. (Ex. 5 at 53:01-08). For summary judgment purposes, Turner's account of this interaction is assumed to be true.

19.     At 12:20 pm, approximately five minutes after Turner's encounter with a deputy on the corner of Hialeah St. and Harrington Dr., Detective Robles, the lead detective assigned to investigate the homicide of Ms. Augustin, arrived on scene. He observed that all the windows of the vehicle were up, there were no bullet holes on the exterior, and there was one spent .40 caliber casing inside the vehicle. (Ex. 1 at 5).

20.     In response to media inquiries, the Sheriff's Office sent the following statement at 12:54 pm to various news outlets:

*Media Partners -*

*On February 22, 2023, at 11:17 a.m., deputies responded to the 6100 block of Hialeah Street in reference to a shooting. Upon arriving, deputies located a female in her 20's who had been shot. She was pronounced deceased on scene. The investigation is in the early stages and this is all the information we have for release at this time.*

(Ex. 13, Statement to Media).

21.     Det. Robles left the scene and arrived at Central Operations to interview Collins. The interview began at approximately 1:30 pm. (Ex. 1 at 6).

### In-Custody Interview of Collins

22.     Det. Robles read Collins his Miranda rights. (Ex. 11 at 14:12-19).

23.     Collins told Det. Robles that he picked up Ms. Augustin, they drove around, and smoked some weed. He saw his "little cousin" walking and looking distraught, so he picked him up and asked him where he wanted to go. His little

8

cousin immediately began giving turn-by-turn directions and then Collins heard a "Boom!". He stopped the vehicle, and his little cousin then jumped out and told Collins to "Go!" (Ex. 11 at 15:05 – 16:09).

24.     Collins said he did not have a gun on him at the time of the shooting and could not tell where the gunshot came from. (Ex. 11 at 21:15 – 22:03).

25.     Collins stated that his cousin's name is Keith, and he wasn't sure what his last name was, but Keith's dad's last name is Moses. (Ex. 11 at 27:23 - 30:14).

26.     Collins stated that he never saw Keith with a gun. (Ex. 11 at 35:06-08).

27.     Collins reiterated that he didn't know how the shooting happened and suggested that Keith jumped from the vehicle and told him, "Go!" because someone was shooting into the car. (Ex. 11 at 36:18-20, 37:05-10).

28.     Collins indicated that he would be able to identify Keith from a picture. (Ex. 11 at 43:20-23).

29.     Collins stated that he did not see where Keith went after he left the vehicle. (Ex. 11 at 66:10-12).

### The Second Shooting

30.     Turner arrived home at 12:15 pm and remained there until 1:55 pm when she left to pick up T'Yonna from school. She returned home with her daughter at approximately 2:15 pm while there was still a police presence on Hialeah St. (Ex. 8 at 25:04-12, 48:09-11, 49:12-15).

31.    Around 2:30 or 3:00 pm, Turner's husband returned home, took a bath, and prepared for a dental appointment scheduled for 3:30 pm. (Ex. 8 at 19:05 – 20:16).

32.    Around 3:30 pm, the Sheriff's Office finished processing the area, removed the tape, and departed. (Ex. 14, Savelli Investigative Report at 34).

33.    At approximately 4:00 pm, Moses entered Turner's house through an unlocked sliding glass door and shot T'Yonna and Turner. (Ex. 8 at 25:23 – 26:05). (Ex. 8 at 27:19-22, 29:14-18).  Before the shooting, Moses was an unknown person to the Turner household. (Ex. 8 at 26:10 – 27:05).

34.    At 4:03 pm, Moses exited Turner's home and approached a van at the corner of Hialeah St. and Harrington Dr. and shot a Spectrum News camera operator and reporter, Dylan Lyons, who died from his injuries. (Doc. 36 ¶¶ 39-45).

35.    In the days that followed Moses' arrest, Detectives would piece together security camera videos from residences along Hialeah Street and discover that after Ms. Augustin was shot, Moses got out of the car 7 to 8 houses down from the location where Collins stopped, walked along Hialeah Street, and entered the backyard of 5926 Harrington Dr., located at the corner of Hialeah and Harrington. (Ex. 14, Savelli Investigative Report at 35; Ex. 3 at 14:25 -16:01).

### III.    SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When a party "assert[s] that a fact cannot be or is genuinely disputed," the party "must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . [by] showing that the materials cited do not establish the absence or presence of a genuine dispute[] or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials" when resolving the motion. Fed. R. Civ. P. 56(c)(3); *see HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) ("This rule was implemented so that a court may decide a motion for summary judgment without undertaking an independent search of the record." (quotation omitted)).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see Burger King Corp. v. Weaver*, 169 F.3d 1310, 1321 (11th Cir. 1999) ("The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." (quotation omitted)). Rather, the non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of

11

material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). In determining whether a genuine dispute of material fact exists, the court must view the evidence and draw all factual inferences in the light most favorable to the non-moving party and must resolve any reasonable doubts in that party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). The court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003).

## IV.    DEPUTY KEYES IS ENTITLED TO QUALIFIED IMMUNITY

### *Fourteenth Amendment Substantive Due Process*

The Fourteenth Amendment establishes that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." In DeShaney v. Winnebago County Department of Social Services, the Supreme Court explained that the text of the amendment limits government power rather than establishing a minimum amount of safety the government must provide.  498 U.S. 189, 195 (1989). "As a general matter, … a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id*. at 195

The Second Amended Complaint invokes the "state-created danger" doctrine to hold Deputy Keyes liable for creating a risk or danger of injury that was later

caused by a private actor.[9] The Eleventh Circuit has long rejected this doctrine as basis for claiming a substantive due process violation. *See Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003). "Thus, the conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense." *Waddell*, F.3d at 1304 (11th Cir. 2003) (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992)).

When shaping the contours of due-process law, the Court has often emphasized the need to prevent the Fourteenth Amendment "from becoming a surrogate for conventional tort principles." *Nix v. Franklin County School Dist.*, 311 F.3d 1373, 1376 (11th Cir. 2002). In a non-custodial setting, "conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense." *Waddell*, 329 F.3d at 1305. "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense; even intentional wrong seldom violate the Due Process Clause." *Waddell*, 329 F.3d at 1305 (internal citations and quotations omitted). "Determinations of what is egregious conduct must not be

---

[9]Turner attempts to assert liability under this theory by alleging that "Deputy Keyes' affirmative conduct here in assuring Brandi Turner that "[e]verything is under control" constituted the necessary state-created danger to trigger the rights secured by the due process clause." (Doc. 36 ¶¶ 77-78).

13

made in the glow of hindsight; decisions made by a government actor *must be egregious—that is, shock the conscience—at the time the government actor made the decision." Id.* (emphasis original).

Turner argues Keyes deprived her of substantive due process by "with[olding] pertinent, significant information regarding an at large murderer in her neighborhood." (Doc. 36 ¶ 67). To amplify the egregiousness of Keyes' conduct, Turner claims Keyes "was objectively aware of the risk of serious harm, recklessly disregarded the risk of harm, and his conduct was arbitrary and conscience shocking" (Doc. 36 ¶¶ 74-76).

Even if, for the sake of argument, Keyes withheld details about a wanted suspect in connection with the shooting from an inquiring passerby, such conduct is hardly sufficient to meet the extreme arbitrary or conscious shocking standard that would suffice for a government actor to run afoul of the Due Process Clause. The Court should grant summary judgment for Keyes on qualified immunity on the allegations within the complaint alone. "No case in the Supreme Court, in this Circuit, or in the Florida Supreme Court has held that a government official's recklessness or deliberate indifference is a sufficient level of culpability to state a claim of violation of substantive due process rights in a non-custodial context." *Waldron v. Spicher*, 954 F.3d 1297 (11th Cir. 2020) (collecting cases).

14

Looking beyond the allegations of the operative complaint, there is no dispute of material fact about the limited information known to Keyes from his arrival at the scene until the purported roadside encounter with an inquiring passerby fifty-five minutes later. Keyes did not know Turner or where she lived. (Ex. 5 at 59:9-11). At most, Keyes knew only that an unidentified female was a victim of homicide by firearm; Collins, the sole witness, claimed that he was just driving around with the victim when he heard a boom, believing someone shot into the car. Minutes later, and upon further questioning by deputies, Collins reveals that his cousin, whom he knew by first name only, of a certain age and physical description, was a backseat passenger who fled the scene in an unknown direction.

Moreover, at the time of the purported encounter, the only known suspect in the shooting, Collins, was in custody, and about to be transported to Central Operations for questioning. Keyes had positioned himself along the crime scene perimeter to provide security, knowing that homicide detectives were on their way along with the forensic unit. (Ex. 5 at 25:24 - 26:04). On these facts, every reasonable deputy would believe that either Collins' obfuscation implicated him in the shooting, and if not Collins, the actual perpetrator would not likely linger near the scene of the crime as deputies went door-to-door to canvass the residents in the neighborhood.

Far removed from the purpose of the Due Process Clause to serve as a check against abuse power by government officials, Turner postulates that Keyes failed to

perform his duties reasonably, which, in hindsight of the heinous crime committed, Turner characterizes as conscious shocking.   Turner argues that had Keyes not acted with reckless disregard, Keyes would have warned her of the lurking danger, the details of which were not known at the time of the encounter and only emerged hours and days later during the homicide investigation.   Turner cites the Due Process Clause to hold Keyes accountable for not knowing Moses shot Ms. Augustin for no apparent reason, minutes after being picked up by Collins; Moses exited the vehicle seven or eight doors down from the scene of the earlier response; and then Moses concealed himself under cover of a nearby residence, armed with a gun and harboring depraved indifference to the public.

There is no case law precedent of a substantive due process violation on these facts. *See Waddell*, 329 F.3d at 1305; *Thomas v. City of Americus, GA*, 2023 WL 2485464. at *3 (11th Cir. 2023) (citing *Waddell*, 329 F.3d at 1305) (holding that the defendants' actions were not arbitrary—and no substantive due process claim existed—when police failed to protect a victim of domestic violence by arresting her murderer before her death).

Further, Turner's claims that Keyes acted with deliberate indifference are insufficient to set aside qualified immunity. *See Thomas*, 2023 WL 2485464. at *3 (affirming dismissal of substantive due process claim where plaintiff alleged that police officers acted with "deliberate indifference" toward decedent and noting that

16

the Eleventh Circuit has 'never held that "deliberate indifference is a sufficient level of culpability to state a claim of violation of substantive due process rights in a non-custodial context.'") (citing *Waldron,* 954 F.3d at 1309); *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005) ("the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its "substantive" manifestations"); *Marcano v. Paulino*, 2025 WL 3771272, at *7 (M.D. Fla. Dec. 31, 2025) (collecting cases dismissing due process claims premised on an affirmative duty of protection that the Supreme Court rejected in *DeShaney*).

## V. SHERIFF MINA IS ENTITLED TO SOVEREIGN IMMUNITY AND SUMMARY JUDGMENT ON COUNT V

Dylan Lyons' personal representative argues that Sheriff Mina owed Lyons an actionable duty of police protection against the crime committed by Moses. The basis for this assertion is dubious, given that the only potential communication between Lyons and the Sheriff's Office (before he went to the scene to prepare a live news broadcast about Augustin's murder) is the 12:54 pm email reporting the "early stages" status of the investigation. When Lyons arrived at the location to prepare for a live report, OCSO deputies were no longer present in the area. Nevertheless, Lyon's personal representative claims that the Sheriff's Office "released information relating to the shooting death of Nathacha Augustin thereby incurring a "duty to protect the news reporters who responded to the scene" (Doc. 36 ¶¶ 117-118, 121-

17

123).    The Sheriff's Office allegedly breached this duty by "removing any remanence of a crime scene" and "failing to secure the area until it was safe." (Doc. 36 ¶¶ 124-25).

Whether a duty of care exists is a question of law. *Wallace v. Dean*, 3 So. 3d 1035, 1046 (Fla. 2009). "[T]here has never been a common law duty to individual citizens for the enforcement of police power functions." *Id.* (quoting *Irving v. St. John*, 2022 WL 3213422, at *3 (M.D. Fla. Aug. 9, 2022) (citing *Trianon Park Condo. Ass'n, Inc. v. City of Hialeah*, 468 So. 2d 912, 914–15 (Fla. 1985))). "Thus, law enforcement officers generally have no legal duty of care to conduct investigations without negligence." *Id.* (citing *Irving*, 2022 WL 3213422, at *3; *Lippman v. City of Miami*, 622 F. Supp. 2d 1337, 1342 (S.D. Fla. 2008) ("Florida law is clear that the negligent conduct of police investigations does not give rise to a cause of action for negligence under Florida law because the 'duty to protect citizens and enforce the law is one owed generally to the public.'")).

"A duty may, however, arise when law enforcement officers become 'directly involved in circumstances which place people within a "zone of risk" by creating or permitting dangers to exist, by taking persons into police custody, detaining them, or otherwise subjecting them to danger.' " *Lippman*, 622 F. Supp. 2d at 1342 (citing *Pollock v. Fla. Dep't of Highway Patrol*, 882 So.2d 928, 935 (Fla. 2004)). "The premise underlying this theory is that a police officer's decision to assume control

18

over a particular situation or individual or group of individuals is accompanied by a corresponding duty to exercise reasonable care." *Pollock*, 882 So.2d at 935.

"[T]o impose a duty, it is not enough that a risk merely exists or that a particular risk is foreseeable; rather, the defendant's conduct must create or control the risk before liability may be imposed." *Manfre v. Shinkle*, 184 So.3d 641, 647-48 (Fla. 5th DCA 2016); *Jordan v. Nienhuis*, 203 So.3d 974, 978 (Fla. 5th DCA 2016). "Where police officers ... have not arrived on the scene or assumed any degree of control over the situation, the 'zone of risk' analysis has no application." *Pollock*, 882 So.2d at 936.[10]

The Sheriff's Office did not owe a special tort duty to Lyons under a zone of risk theory. The Sheriff's Office never interacted with Lyons and did not assert control over him or the circumstance in which he operated as a live action reporter. The Sheriff's Office statement at 12:54 pm informed the media when and where a fatal shooting had occurred and informed the media that the investigation was "in the early stages and this is all the information we have for release at this time." This ordinary statement to the media would not reasonably inform a belief about public safety or the status of the perpetrator of the crime.[11] Furthermore, there would be

---

[10]See *Manfre*, 184 So.3d at 648 n.2 for a collection of cases where courts have applied the special duty exception.

[11]Defendant request that the Court take judicial notice of *Lyons v. Charter Communications*, case no.: 6:25-cv-00848-ACC-LHP. In that case, Plaintiff Lyons sued Dylan Lyons' employer alleging that it deliberately concealing the danger presented by

no reason for the Sheriff's Office to hold law enforcement on Hialeah Street in service of warning reporters that the potential suspect could be lingering near the crime scene. Individuals who commit crimes usually flee the scene.[12]

Even if Lyon's allegations were sufficient to trigger a special tort duty of care owed to him, the Sheriff's Office is entitled to sovereign immunity on Count V. Sovereign immunity stems from the separation of powers provision present in article II, section 3 of the Florida Constitution and it requires that "certain [quasi-legislative] policy-making, planning or judgmental governmental functions cannot be the subject of traditional tort liability." *Wallace*, 3 So. 3d at 1053 (citing *Commercial Carrier Corp. v. Indian River County*, 371 So.2d 1010, 1020 (Fla. 1979). "*Planning level functions* are generally interpreted to be those requiring basic policy decisions, while *operational level functions* are those that implement policy." *Id.* (quoting *Commercial Carrier*, 371 So.2d at 1021).

---

Moses. In that case, Lyons was alleged to have known "that a shooting had taken place, and that the shooter was still at large." (Doc. 33 at 8).

[12]From a public policy perspective, it would be a terrible idea to expose local law enforcement agencies to civil liability for releasing factually accurate information about ongoing criminal activity to news outlets. Agencies would become reluctant to release information to the public before they have taken a suspect into custody for fear of getting sued should the perpetrator commits additional crimes. *See Gross v. Family Services Agency, Inc.*, 716 So.2d 337, 338 (Fla. 4th DCA 1998)("Whether a duty arises in any particular context is resolved as a matter of law after weighing "the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." (citing *Rupp v. Bryant*, 417 So.2d 658, 667 (Fla.1982) (quoting W. Prosser, The Law of Torts § 53, at 325–26 (4th ed.1971))).

Decisions about whether to restrict access to or provide security for media personnel reporting from a crime scene concern functions that involve a matter of basic governance and law enforcement planning—how to allocate scarce resources. The Sheriff's Office is immune from liability for these planning level functions. *See Sanchez v. Miami–Dade County*, 245 So.3d 933, 938 (Fla. 3d DCA 2018) ("The decisions of the County regarding where and how to deploy its available manpower (sworn police officers) is a discretionary or planning function."), *Broward County v. Manarite*, 333 So.3d 1130, 1035 (Fla. 4th DCA 2022) ("county's decisions not to supervise the worksite or require additional workers or police to direct traffic and pedestrians at the worksite were discretionary planning-level functions which cannot subject the county to tort liability.").

## VI. SHERIFF MINA IS ENTITLED TO SOVEREIGN IMMUNITY AND SUMMARY JUDGMENT ON COUNT VIII

Count VIII is a claim for negligence predicated on Keyes' encounter with Turner at 12:15 pm coupled with criticisms of the Sheriff's Office response. Specifically, Turner claims that "the undertaker's doctrine was triggered" when Keyes affirmatively "promised and assured Brandi Turner that '[e]verything is under control.'" (Doc. 36 ¶¶ 143, 147). This assertion is equivalent to claiming Keyes should have given a warning about Moses lurking in the area. This characterization reflects the structural logic of a failure to warn claim. The wrongful conduct is the absence of action, not the performance of a harmful act. Concerning the Sheriff's

21

Office, Turner is critical of the agency's failure to launch aviation, failure to deploy K-9, and failure to warn her and the public of the danger Moses presented.  (Doc. 36 ¶¶ 22-23, 55-57).[13]

### A. Special Relationship Exception to the Public Duty Doctrine

To establish a special relationship exception to the public duty doctrine, Turner must show:

1) an express promise or assurance of assistance;
2) justifiable reliance on the promise or assurance of assistance; and,
3) harm suffered because of the reliance upon the express promise or assurance of assistance.

*Jordan v. Nienhuis*, 203 So.3d 974, 977 (Fla 5th DCA 2016). On the summary judgment record, it is not reasonable to construe Keyes' statement as "*an express promise or assurance of assistance*" for Turner's safety.[14] *Jordan*, 203 So.3d at 977 Keyes could not have made an actionable offer or promise of police protection.  First, Turner did not inform Keyes where she lived and Keyes did not ask. Second, Keyes was unaware whether Collins' account of the shooting was real or fictional; whether

---

[13]The Second Amended Complaint contains no allegations regarding the use of a K9 unit, but Turner's police practices expert contends that Deputy Keyes "made a tactical error by dismissing the K9 unit's capabilities and failing to allow the deputy and her K9 to track the suspect."

[14]Florida cases provide examples of express promises for assistance. In *Hartley v. Floyd*, 512 So.2d 1022 (Fla. 1st DCA 1987) a deputy gave an express promise to go to a boat ramp to check for vehicle and boat trailer and to notify the Coast Guard after a man was reported several hours overdue returning from a two-day fishing trip but failed to do either. In *St. George v. City of Deerfield Beach*, 568 So.2d 931 (Fla. 4th DCA 1990), a 911 operator promised to dispatch paramedics but failed to do so. In *Brown v. City of Delray Beach*, 652 So.2d 1150 (Fla. 4th DCA 1995) the City promised to preserve and safeguard physical evidence of a hit and run but lost or discarded the evidence.

the third occupant of vehicle was armed or dangerous; or whether the occupant was lingering in the area. Thus, Sheriff Mina is entitled to summary judgment on Turner's claim premised on an express promise of assurance of police protection.

### B. Voluntary Undertaking Exception to the Public Duty Doctrine

> [O]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> > (a) his failure to exercise such care increases the risk of such harm, or
> > (b) the harm is suffered because of the other's reliance upon the undertaking.

*Wallace v. Dean*, 3 So.3d 1035, 1047 (Fla. 2009). (citing Restatement (Second) of Torts § 323 (1965)).

Turner fails to identify any unique service provided by Keyes apart from responding to the emergency call and preserving the crime scene for the ensuing investigation. The brief interaction was initiated by Turner. Keyes responded to a single, general question with an equally nonspecific answer. Keyes did not encourage Turner to leave her home unsecured against a potential intruder. At bottom, Keyes did not deviate from his crime-scene-security duties to undertake any act or promise any services unique to Turner.

### C. Sheriff Mina Did Not Owe Plaintiffs a Duty to Investigate in the Manner Preferred by Plaintiffs

23

Plaintiffs seek to hold the Sheriff's Office liable for not deploying the aviation (helicopter) unit or K9 and failing to inform the community that there was an armed and dangerous suspect at large. Plaintiffs contend that the Sheriff's Office should have taken these steps and was negligent for not doing so.

The Florida Supreme Court has provided a "'rough,' general guide concerning the type of activities that either support or fail to support the recognition of a duty of care between a governmental actor and an alleged tort victim." *Wallace*, 3 So. 3d at 1046 (citing *Trianon*, 468 So.2d at 919 (providing the following list of governmental activities: "(I) legislative, permitting, licensing, and executive officer functions; (II) enforcement of laws and the protection of the public safety; (III) capital improvements and property control operations; and (IV) providing professional, educational, and general services for the health and welfare of ... citizens."). "Activities falling within category II are generally owed to the public at large." Acts of omission, in contrast to acts of commission, "historically …are more restricted, and in general are confined to situations where there is a special relation between the actor and the other which gives rise to the duty." *U.S. v. Stevens*, 994 So.2d 1062 (Fla. 2008).

Here, allegations concerning a failure to use of K9 and aviation units and the failure to issue public updates on the investigation are Category II functions that involve the enforcement of laws and the protection of public safety.   Therefore, any

24

duty owed is to the public at large, not any individual Plaintiff. *See Everton v. Willard*, 468 So.2d 936, 938 (Fla. 1985) ("A law enforcement officer's duty to protect the citizens is a general duty owed to the public as a whole. The victim of a criminal offense, which might have been prevented through reasonable law enforcement action, does not establish a common law duty of care to the individual citizen and resulting tort liability, absent a special duty to the victim"); *Wallace*, 3 So. 3d at 1047 n. 20 (collecting cases identifying law enforcement activities that are deemed Category II functions).

Additionally, the Sheriff's Office is entitled to sovereign immunity on Count VIII. The decisions regarding whether to deploy K9 units and aviation units during an investigation are, like the decision of whether to deploy law enforcement to provide security for local media reporting in the field, matters of governance and basic policy. See *Sanchez*, 245 So.3d at 938; *Manarite*, 333 So.3d at 1035. Further, the decisions regarding whether to notify the public about law enforcement activity in the community, as well as when, what means of communication, and what information to include in the notifications are likewise basic policy decisions that are not subject to judicial review. *See Delgado v. City of Miami Beach*, 518 So. 2d 968, 969 (Fla. 3d DCA 1988) ("The manner in which a city, through its police officers, exercises discretionary authority to enforce compliance with the laws and protect the public safety, falls squarely within the city's power to govern.")

## VII.   CONCLUSION

For the foregoing reasons, Defendants request that the Court grant summary judgment on all Counts in the Second Amended Complaint.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 2, 2026, I electronically served the foregoing via email to the following: DeLayne D. Penland, Esq., (delayne@nejamelaw.com), Mark E. NeJame, Esq., (mark@nejamelaw.com), Ryan J. Vescio, Esq., (ryan@nejamelaw.com), and Richard W. Smith, (richard@nejamelaw.com), pi@nejamelaw.com, NeJame Law, P.A., 111 North Orange Avenue, Suite 1300, Orlando, Florida 32801.

*/s/ Brian F. Moes*
Brian F. Moes, Esquire
Florida Bar No. 39403
G. Ryan Dietrich, Esquire
Florida Bar No. 1007940
Counsel for Defendants
DeBevoise & Poulton, P.A.
1035 S. Semoran Blvd., Suite 1010
Winter Park, FL 32792
Telephone:  407-673-5000
Facsimile:   321-203-4304
Email:
Moes@DeBevoisePoulton.com
Dietrich@DeBevoisePoulton.com
Paralegal@DeBevoisePoulton.com
