UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

BRANDI TURNER, individually, and
As the Personal Representative for the
Estate of T'Yonna Major, and GARY
LYONS as the Personal Representative
For the Estate of Dylan Lyons,

    Plaintiffs,

                           CASE NO: 6:25-cv-00252-PGB-UAM

vs.

JACKSON B. KEYES, an individual,
And JOHN MINA, in his official capacity
as Sheriff of Orange County,

    Defendants.

_____/

## PLAINTIFFS' RESPONSE TO DEFENDANTS JOHN MINA AND JACKSON B. KEYES' MOTION FOR SUMMARY JUDGMENT

COME NOW, Plaintiffs, BRANDI TURNER individually and as the Personal Representative for the Estate of T'Yonna Major, and GARY LYONS, as the Personal Representative for the Estate of Dylan Lyons, by and through their undersigned counsel, and hereby file this Response to Defendants John Mina and Jackson B. Keyes' Motion for Summary Judgment (the "Motion for Summary Judgment"), as follows:

### I. INTRODUCTION

1

1.      The Motion for Summary Judgment rests on a fundamentally flawed characterization of this case as a mere failure-to-protect claim barred by DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989). That framing collapses under the undisputed evidence.

2.      The record presents classic jury questions, and viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that Defendants' conduct was arbitrary, reckless, and conscience-shocking, thereby precluding summary judgment and defeating qualified immunity.

## II. STATEMENT OF FACTS[1]

3.      The Plaintiffs allege the following additional facts.

4.      At all relevant times, Defendant Keyes and other responding deputies were aware that a random and unprovoked homicide had ~~just~~ recently occurred only hours before in the immediate residential community and that the armed perpetrator remained at large. Officers were provided identifying information regarding the suspect, including his name, physical description, and direction of travel. (Ex. B, Rodriguez Rep. at 12–13).

---

[1] The Plaintiffs adopt and incorporate the Agreed Material Facts as contained in the Motion for Summary Judgment

5.      Despite this knowledge, Defendant Keyes affirmatively told Plaintiff Brandi Turner that "everything is under control," thereby inducing her to return to her residence with her child. (Ex. A, Keyes Dep. 41:10–22).

6.      Plaintiffs' expert, Jeronimo Rodriguez, a veteran law enforcement professional, concluded that this conduct was inconsistent with accepted police practices.

7.      Specifically, Rodriguez opined that officers should not make assurances of safety where an armed suspect remains at large. (Ex. B, Rodriguez Rep. at 13–14), and that a reasonable officer would not have handled the situation in the manner reflected in the record. (Ex. C, Rodriguez Dep. 43:10–22).

8.      Rodriguez concluded that deputies "made no reported efforts to locate and apprehend this armed and highly dangerous suspect." (Ex. B, Rodriguez Rep. at 13). In deposition, he confirmed that he "reviewed nothing that detailed an active search" for the suspect. (Ex. C, Rodriguez Dep. 63:1–10).

9.      In addition, Defendants failed to deploy available law enforcement tools that constitute standard practice in a manhunt for an armed suspect. Rodriguez concluded that the failure to utilize K9 tracking and aviation resources constituted a tactical error. (Ex. B, Rodriguez Rep. at 13–15), and there is no evidence that aerial support was ever requested or deployed. (Ex. C, Rodriguez Dep. 60:15–61:5).

10.    Rodriguez explained that when a violent suspect remains at large in a residential area, officers must take steps to alert residents and ensure community safety. (Ex. B, Rodriguez Rep. at 15; Ex. C, Rodriguez Dep. 42:1–15).

11.    At all relevant times, Defendant Keyes and other responding deputies were aware that a random and unprovoked homicide had just recently occurred only hours before in the immediate residential community and that the armed perpetrator remained at large in the surrounding residential community. Officers were provided identifying information regarding the suspect, including his name, physical description, and direction of travel. (Ex. B, Rodriguez Rep. at 12–13).

12.    Rodriguez concluded that had proper warnings been issued and basic police practices followed, the harm could have been prevented. (Ex. B, Rodriguez Rep. at 15).

### III. LEGAL STANDARD

13.    Summary judgment is appropriate only where "there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

14.    The Eleventh Circuit has repeatedly emphasized that courts must "view the evidence and all factual inferences therefrom in the light most favorable to the nonmoving party." Skop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007). The Court may not weigh evidence, resolve credibility disputes, or choose

between competing versions of events, as such functions are reserved for the jury.

Id.

15.     These principles are especially critical in qualified immunity cases, which frequently turn on disputed factual issues. While qualified immunity is a legal question, it cannot be resolved where the underlying facts are contested. *See* Tolan v. Cotton, 572 U.S. 650, 657 (2014). Courts must adopt the plaintiff's version of events where supported by record evidence. Id.

16.     In substantive due process cases, the determination of whether conduct is "conscience-shocking" requires a fact-intensive inquiry into the totality of circumstances, including what the officer knew, the severity of the risk, and the nature of the response. *See* Waddell v. Hendry Cnty. Sheriff's Off., 329 F.3d 1300, 1305 (11th Cir. 2003).

### IV. ARGUMENT

*A.    THIS CASE FALLS OUTSIDE DESHANEY BECAUSE DEFENDANTS ENGAGED IN AFFIRMATIVE CONDUCT*

17.     Defendants rely on DeShaney, which held that the Constitution does not impose a general duty on the State to protect individuals from private violence. 489 U.S. at 197.

18.     However, DeShaney addressed only passive inaction by law enforcement after a child protection team determined there was insufficient

5

evidence of child abuse to retain a young child in the custody of the court from his father who would subsequently severely attack the child. Id. at 192-3.

19.     The basis of the 42 U.S.C. § 1983 action in DeShaney alleged that law enforcement failed "to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." Id. at 193.

20.     The Eleventh Circuit has consistently recognized that liability can arise where government officials engage in affirmative conduct that increases the risk of harm.

21.     In White v. Lemacks, the court acknowledged that substantive due process may be implicated where officers act in a manner that places individuals in a more dangerous position than they would have otherwise occupied, which in certain circumstances, can establish that deliberate indifference can "shock the conscience." 183 F.3d 1253, 1257–58 (11th Cir. 1999).

22.     In Dept. of Highway Safety & Motor Veh. V. Kropff, 491 So.2d 1252, 1255 (Fla. 3d DCA 1986), the court determined that the trooper was performing a specific procedure for the protection of the public, and thus an operational function:

> The distinction between the discretionary decision of a police officer to not enforce a law or to not perform an activity for the protection of the public versus the operational level activity of a police officer in performing a specific public safety activity was explained in Eder v. Department of Highway Safety and Motor Vehicles, 463

So.2d 443 (Fla. 4th DCA), *review denied*, 475 So.2d 694 (Fla.1985). In Eder, the trooper observed a non-functioning traffic light at an intersection. He also noted that motorists were not treating the non-functioning light as a stop sign, as was required by statute. The trooper was faced with the decision of either directing traffic, issuing citations to motorists who failed to stop at the intersection, or continuing on patrol. He chose to issue citations and while he was doing so, an accident occurred at the intersection. The court held the state was immune from suit for the trooper's decision to issue citations. However, it said, "Had Trooper Chafey decided to direct traffic and done so in a negligent fashion, then an action for negligence would seem appropriate." Eder v. Department of Highway Safety and Motor Vehicles, 463 So.2d at 444.

Kropff, 491 So.2d at 1255.

23.   Further, in Vaughan v. Cox, the Eleventh Circuit held that law enforcement officers could be liable where their conduct during a pursuit created an unjustified risk of harm to third parties when such conduct can bear out foreseeable consequences. 343 F.3d 1323, 1332–33 (11th Cir. 2003).

24.   In the state-created or enhanced danger doctrine, the doctrine necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger. Graham v. Independent Sch. Dist. No. I–89, 22 F.3d 991, 995 (10th Cir.1994). Inaction by the state actor in the face of a known danger is not enough to trigger a constitutional duty to protect. *See* Id.

7

25.     In the instant case, Defendant Keyes engaged in affirmative conduct by advising Plaintiff Turner that the area was clear, thus safe.  This placed Plaintiff Turner and her daughter in enhanced mortal danger.

26.     To provide false information meant Defendant Keyes knew of and disregarded an extremely great risk to Plaintiff Turner and her daughter's safety. *See* Waddell, 329 F.2d at 1306.

27.     The conduct here fits squarely within that framework. Defendant Keyes affirmatively told Plaintiff Turner that "everything is under control," despite knowing that an armed homicide suspect remained at large in her immediate vicinity. (Ex. A, Keyes Dep. 41:10–22).

28.     This statement did not merely fail to protect Turner; it actively induced her to return to a dangerous environment she otherwise would have avoided. At the moment that Defendant Keyes made this statement of security, it was widely known to both Defendant Keyes and other OCSO personnel that a third suspect, who fled the scene of the shooting of Ms. Augustin, was unaccounted for, and no firearm was recovered from the scene.

29.     As argued by the Defendants, Calvin Collins was either in the process, or about to be transported to the OCSO Central Operations Center. In doing so, law enforcement were aware that Mr. Collins was unarmed.

30.     Plaintiffs' expert confirmed that such a statement constitutes a deviation from accepted law enforcement practices in the presence of an armed suspect. (Ex. B, Rodriguez Rep. at 13–14; Ex. C, Rodriguez Dep. 43:10–22). By providing a false assurance of safety, Defendants materially increased the risk of harm to Plaintiffs.

31.     Accordingly, this case is not governed by DeShaney, and instead, in a light most favorable to the Plaintiffs, involves affirmative nonfeasance that exposed Plaintiffs to a foreseeable and heightened danger.

*B.   A REASONABLE JURY COULD FIND DEFENDANTS' CONDUCT CONSCIENCE-SHOCKING*

32.     Substantive due process is violated where government conduct is arbitrary or conscience-shocking. Waddell, 329 F.3d at 1305. In determining whether conduct meets this standard, courts consider whether officials acted with deliberate indifference to known and serious risks that places a victim in special danger of harm.

33.     The Eleventh Circuit has held that conduct may be conscience-shocking where officials knowingly disregard an extreme risk to human life. In Davis v. Carter, the court explained that deliberate indifference in the face of a known, life-threatening condition can satisfy the standard. 555 F.3d 979, 982–83 (11th Cir. 2009).

34. Likewise, in <u>Vaughan</u>, the court found that creating an unreasonable risk of serious harm through law enforcement conduct can support a substantive due process claim. 343 F.3d at 1333.

35. Here, the record reflects that Defendants knew an armed homicide suspect remained at large in a residential neighborhood. (Ex. B at 12–13). Despite that knowledge, Defendants failed to conduct any meaningful search, and allowed the crime scene involving the vehicle where the initial shooting take place not be properly preserved. Rodriguez concluded that "no reported efforts" were made to locate the suspect, and confirmed in deposition that he found no evidence of an active search. (Ex. B at 13; Ex. C, Rodriguez Dep. 63:1–10).

36. Defendants further failed to deploy basic resources such as K9 units or aviation support, despite the time-sensitive nature of the situation. (Ex. B at 13–15; Ex. C at 60:15–61:5). These omissions are not minor; they represent a complete failure to utilize standard law enforcement tools in response to a known, armed suspect.

37. Defendants also failed to warn the public of the ongoing danger. Rodriguez explained that law enforcement must alert residents when a violent suspect remains at large. (Ex. B at 15; Ex. C at 42:1–15).

38. Most critically, Defendant Keyes affirmatively misrepresented the situation as being "under control." A jury could reasonably conclude that

10

providing a false assurance of safety under these circumstances demonstrates a reckless and conscious disregard for human life.

39.     Taken together, these facts go far beyond negligence and instead, establish a pattern of conduct that a reasonable jury could find arbitrary, reckless, and conscience-shocking that ultimately led to the death of T'Yonna Major .

*C. QUALIFIED IMMUNITY DOES NOT APPLY*

40.     "Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir.2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

41.     Qualified immunity shields officials only where their conduct does not violate clearly established constitutional rights. Waldron v. Spicher, 954 F.3d 1297, 1304 (11th Cir. 2020).

42.     In Vaughan, the Eleventh Circuit denied qualified immunity where officers engaged in conduct that created a substantial risk of serious harm. 343 F.3d at 1333.

43.     A reasonable officer would understand that falsely assuring a civilian of safety in the presence of an armed, unapprehended murderer—while

11

simultaneously failing to conduct any meaningful search or issue warnings—violates fundamental constitutional principles.

44.     Moreover, qualified immunity cannot be resolved where material facts are disputed. *Tolan*, 572 U.S. at 657. Here, disputes exist regarding Defendants' knowledge, actions, and the reasonableness of their conduct. Under Plaintiffs' version of the facts, Defendants knowingly misled a civilian into a dangerous situation, precluding immunity.

*D. PLAINTIFFS' STATE LAW CLAIMS PRESENT TRIABLE ISSUES*

45.     Under Florida law, a special duty arises where law enforcement provides express assurances that induce reliance. Jordan v. Nienhuis, 203 So. 3d 974, 978 (Fla. 5th DCA 2016), *see also* Bongiorno v. Americorp, Inc., 159 So.3d 1027, 1029-30 (Fla. 5th DCA 2015).

46.     Defendant Keyes' statement that "everything is under control" constitutes such an assurance. Plaintiff Turner relied on that statement in returning to her home. (Ex. A, Keyes Dep. 41:10–22).

47.     Florida courts have recognized that such assurances create a duty where reliance is foreseeable or places a person within a certain "zone of risk". *See* Wallace v. Dean, 3 So. 3d 1035, 1048 (Fla. 2009), *citing* Pollock v. Fla. Dep't of Highway Patrol, 882 So.2d 928 (Fla. 2004).

12

48. Defendants also created a zone of risk by clearing the scene and failing to communicate the ongoing danger. This conduct foreseeably exposed residents to harm.

49. Finally, Defendants' actions were operational, not discretionary. Decisions regarding search efforts, deployment of resources, and warnings to the public are real-time tactical decisions, not protected policy judgments. Id. at 1046.

*50.* Accordingly, Plaintiffs' state law claims cannot be resolved as a matter of law.

*E. SHERIFF MINA IS NOT ENTITLED TO SOVEREIGN IMMUNITY OR SUMMARY JUDGMENT ON COUNT V RELATED TO THE DEATH OF DYLAN LYONS*

51. Defendants' argument that no duty existed as to the death of Dylan Lyons is premised on an artificially narrow and legally incorrect characterization of both the factual record and governing Florida law. Their attempt to reduce this claim to one involving a generalized failure to protect the public ignores the undisputed evidence that law enforcement, through its affirmative conduct, created and perpetuated a foreseeable zone of lethal risk that directly encompassed members of the media—including Dylan Lyons—who predictably responded to the scene.

52. The record establishes that, by approximately 12:54 p.m., the Orange County Sheriff's Office affirmatively communicated to the media that a fatal

shooting had occurred in the Pine Hills neighborhood and that the investigation remained in its "early stages."

53.     That communication was not passive, but instead an intentional dissemination of information designed to prompt media presence at an active homicide scene, but failed to warn that a violent and armed suspect remained unaccounted for in the immediate residential area.

54.     Defendants assert that Sheriff Mina is entitled to sovereign immunity on Count V by characterizing the conduct at issue as discretionary, planning-level decision-making. Under Florida law, sovereign immunity does not shield government actors from liability arising out of the negligent performance of operational duties once the government undertakes to act. Commercial Carrier Corp. v. Indian River Cnty., 371 So. 2d 1010, 1020 (Fla. 1979).

55.     In Wallace, 3 So. 3d 1035, the Supreme Court of Florida held that once law enforcement officers are on scene and responding to an emergency, their conduct is operational in nature and must be evaluated under a reasonable care standard. The Court held, "the affirmative actions of the deputies involved in this case were operational in nature; therefore, sovereign immunity does not bar the plaintiff-petitioner's negligence-based wrongful-death claim." Id. at 1040.

56.     The Court rejected the precise argument advanced by Defendants here—that real-time law enforcement decision-making can be recast as

14

discretionary policy—holding instead that officers "on the scene" are engaged in operational activity for which sovereign immunity does not apply. Id. at 1047, 1053-54. That principle squarely governs this case, where deputies were actively responding to a homicide scene and an unfolding threat.

57.     The record establishes that Defendants' conduct arose entirely from real-time actions taken during an active emergency. Deputies were aware that a homicide had just occurred and that an armed suspect remained at large in the immediate residential area. (Ex. B, Rodriguez Rep. at 12–13).

58.     Despite this knowledge, Defendants failed to initiate any meaningful search, failed to deploy available resources, failed to warn the public, and most critically, affirmatively misrepresented the safety of the scene to Plaintiff Turner. (Ex. A, Keyes Dep. 41:10–22; Ex. C, Rodriguez Dep. 42:1–15, 60:15–61:5, 63:1–10). Each of these actions constitutes operational conduct under Wallace and Commercial Carrier.

59.     The United States Supreme Court in DeShaney expressly distinguished between failures to act and situations in which the State "affirmatively place[s]" an individual in danger or renders them more vulnerable to harm. 489 U.S. 189, 201 (1989).

60.     In this case, Defendant Keyes affirmatively told Plaintiff Turner that "everything is under control," despite knowing that an armed homicide suspect

15

remained at large in her immediate vicinity. (Ex. A, Keyes Dep. 41:10–22). This statement materially altered Turner's perception of risk and induced her to return to a location that remained dangerous.

61.    Plaintiffs' expert, Jeronimo Rodriguez, testified in his deposition that "[a] reasonable officer… with information that an armed suspect… walked into the community would not have handled it the same way." (Ex. C, Rodriguez Dep. 43:10–22).

62.    In Kaisner v. Kolb, the Florida Supreme Court held that once officers create a zone of danger through their conduct, they owe a duty of reasonable care to those foreseeably harmed. 543 So. 2d 732, 735 (Fla. 1989).

63.    Here, Defendants created precisely such a zone of risk by clearing the scene, failing to communicate the ongoing threat, and affirmatively representing that the situation was under control. The combination of these actions conveyed a false sense of safety to nearby residents, including Plaintiff Turner, despite the continued presence of a dangerous, armed suspect.

64.    Defendants further attempt to avoid liability by asserting that there was no direct interaction between law enforcement and Lyons.

65.    Florida courts have repeatedly recognized that direct, face-to-face contact is not required where a defendant's conduct creates a zone of risk that foreseeably exposes others to harm. See Kolb, 543 So.2d at 735.

16

66.    The record further establishes that Defendants not only misrepresented the safety of the scene but failed to take even the most basic operational steps to mitigate the known danger. Rodriguez found that deputies "made no reported efforts to locate and apprehend this armed and highly dangerous suspect." (Ex. B, Rodriguez Rep. at 13).

67.    Rodriguez confirmed in deposition that he "reviewed nothing that detailed an active search for Mr. Moses." (Ex. C, Rodriguez Dep. 63:1–10). With respect to available resources, Rodriguez testified that he "read nothing… where any attempts were done to bring in… aerial support" (Ex. C, Rodriguez Dep. 60:15–61:5), despite the immediate need to locate an armed suspect following a homicide.

68.    Equally critical is Defendants' complete failure to warn the public. Rodriguez explained that when a violent suspect remains at large in a residential area, "efforts must be made… to alert the community about the ongoing threat." (Ex. B, Rodriguez Rep. at 15).

69.    The Defendants undertook these actions while the suspect, Keith Moses, remained in the immediate vicinity after fleeing the initial shooting, concealed himself within the residential neighborhood, and ultimately committed a second shooting in the same geographic area.

70.     At approximately 4:03 p.m., Moses approached a news crew and fataly shot Dylan Lyons, which was the direct and foreseeable consequence of leaving an armed, mobile, and unidentified suspect at large while simultaneously allowing civilians to re-enter the area without warning or protection.

71.     The Eleventh Circuit has repeatedly recognized that liability may arise where law enforcement officers, through affirmative conduct, place individuals in a position of greater danger than they would have otherwise faced. In Vaughan v. Cox, the court denied qualified immunity where officers' actions created an unreasonable risk of serious harm, emphasizing that affirmative conduct increasing danger may give rise to liability. 343 F.3d at 1332–33.

72.     Plaintiffs have also established the existence of a special duty arising from Defendants' express assurances. Under Florida law, a special duty arises where law enforcement officers make an express promise or assurance, the plaintiff relies on that assurance, and the reliance results in harm. *See* Jordan, 203 So. 3d at 978.

73.     In this case, Defendant Keyes expressly assured Plaintiff Turner that the situation was under control, Turner relied on that assurance in returning home, and the resulting harm was both direct and foreseeable in light of the known presence of the armed suspect.

74. The issue of causation further precludes summary judgment. Rodriguez expressly opined that "[h]ad proper warning been given… some of the deaths… may have been prevented." (Ex. B, Rodriguez Rep. at 15). He further testified that allowing individuals "back into a scene that was not yet secure… contributed to… Moses being able to… enter [the residence]." (Ex. C, Rodriguez Dep. 53:1–15).

75. Decisions regarding whether to search for a suspect, deploy available resources, warn civilians, and communicate information at an active crime scene are not policy determinations; they are the day-to-day operational functions of law enforcement. Under <u>Wallace</u> and <u>Kaisner</u>, such conduct is not protected by sovereign immunity.

76. Defendants' reliance on public duty doctrine principles is similarly misplaced. While it is true that law enforcement generally owes duties to the public at large, Florida law is equally clear that liability arises where officers create or control a zone of risk through their conduct. <u>Pollock v. Fla. Dep't of Highway Patrol</u>, 882 So.2d 928, 935 (Fla. 2004).

77. The foreseeable presence of media personnel at a homicide scene transforms what Defendants attempt to characterize as a generalized risk into a particularized and legally cognizable duty through the creation of a zone of risk.

78.     A reasonable jury could conclude that this conduct did more than merely fail to protect as it affirmatively created a foreseeable risk to a discrete and identifiable class of individuals: journalists responding to an active homicide scene in reliance on official law enforcement communications.

79.     Dylan Lyons was not an unknown or unforeseeable member of the public; he was a professional news reporter performing the precise function that Defendants' media release was intended to prompt. The foreseeability of his presence, and the corresponding risk imposed by an unsecured crime scene containing an armed fugitive, is not subject to reasonable dispute.

## V. CONCLUSION

80.     This case does not present a failure-to-protect claim, but instead, a case in which law enforcement officers, aware of a known and active lethal threat, failed to take basic protective measures and affirmatively misled a civilian regarding her safety.

81.     The record, viewed in Plaintiffs' favor, supports a finding that Defendants' conduct was arbitrary, reckless, and conscience-shocking. It further supports findings that Defendants increased the risk of harm through affirmative conduct and that their actions directly contributed to Plaintiffs' injuries.

82.     For all of these reasons, Defendants' Motion for Summary Judgment must be denied.

**RESPECTFULLY** submitted this 23rd day of June, 2025.

*/s/ Ryan J. Vescio*__
**Mark E. NeJame, Esq.**
Florida Bar Number: 310931
**Ryan J. Vescio, Esq.**
Florida Bar No. 14032

**NEJAME LAW, P.A**
111 N. Orange Avenue, Suite 1300
Orlando, FL 32801
PH: (407) 500-0000
F:    (407) 802-1448
mark@nejamelaw.com
ryan@nejamelaw.com
PI@nejamelaw.com

*Attorney(s) for Plaintiffs*